THE STATE v. ARTHUR ALLISON, Appellant.—51 S. W. (2d) 51.

Division Two, June 10, 1932.

*Bradley & Bradley* and *Langdon R. Jones* for appellant.

*Stratton Shartel,* Attorney-General, and *Walter E. Sloat,* Assistant Attorney-General, for respondent.

776

COOLEY, C.—In the Circuit Court of Dunklin County defendant was charged by information with murder in the first degree for the alleged killing in said county of his wife, Pearl Allison. He was convicted of murder in the second degree and sentenced to ten years' imprisonment in the penitentiary and has appealed. The deceased was killed by the discharge of a shotgun fired in close proximity to her head. No one, unless it was defendant, witnessed the shooting. The theory of the State is that defendant fired the shot; that of the defense that Mrs. Allison committed suicide.

Mr. and Mrs. Allison, with their three young children, resided in a small frame house about four miles from Kennett, Missouri. The room occupied by the family as a sleeping room and in which the shooting occurred was in the northeast corner of the house. West of it and separated from it by an unplastered partition was a room then occupied by a lodger, one Payton. It appears there was no door

between those two rooms, each being entered through a door opening into it from a room to the south. The northeast room was eleven and one-half or twelve feet square. It had two windows, one on the north and one on the east side, the latter being somewhat nearer the southeast than the northeast corner of the room. There were two beds in the room, one in the northeast and the other in the northwest corner, each practically against the walls with its head to the north, leaving a space some two feet wide between the beds.

About midnight of June 23, 1929, neighbors of the Allisons were aroused by defendant and informed that his wife was dead. Deceased was found lying across the foot of the bed situated in the northeast corner of the room above described. Her head was very near the east window, somewhat nearer the south than the north side thereof, with the feet hanging or projecting over the opposite side of the bed. The head rested upon two pillows which elevated it six inches or so above the level of the bed. The top of the bed was about two feet above the floor. Deceased lay on her back on top of the bedcovering and was clad only in vest and bloomers. On the bed near her right side lay a single-barrelled shotgun, its muzzle six to ten inches from her head. It was not parallel with the body, the butt or stock being somewhat more to the north of the body than the muzzle. The barrel lay across or, as some witnesses put it, was loosely grasped—not gripped—in deceased's right hand. A stick, described as a "toy golf stick," lay beside the gun with the knob or curved end in the trigger guard of the gun in front of the trigger and the other end near deceased's left hand which lay across her body. Some evidence indicated that the end of the stick was in contact with deceased's left hand though, like the gun, not grasped tightly.

The charge from the gun had struck deceased's head somewhere along the right side or temple and had practically blown off the top and right side of her head above the point where the charge struck. The entire contents of the cranial cavity had been blown out. Blood and brains were found upon pillows and bedcovering, on the window sill and the floor beneath, and the east wall of the room from the window south to the southeast corner of the room was spattered with blood and particles of brain substance. The stains on the wall extended to the ceiling seven and one-half or eight feet from the floor, and some were found on the south wall near the corner. The window was closed and the panes were not broken. The blood stains on the wall, as described by witnesses, indicate that when fired the gun must have been pointed somewhat toward the southeast and upward rather than horizontally or downward. The testimony of one of the State's witnesses, Dr. Presnall, who saw the blood stains on the walls and was given by hypothetical questions the effect the shot had produced on deceased's skull, expressed the opinion that the gun would

not have had sufficient elevation to account for all the phenomena if deceased had been lying down with her head on the pillows only six inches above the bed and with the butt of the gun on the bed when discharged, but that if she was sitting on the bed the elevation would have been sufficient; and that, if sitting, the body would probably have fallen backwards with muscles relaxed from the paralyzing effect of the wound.

A coroner's inquest was held that night at the house by the light of a coal oil lamp. Several lay witnesses, some of whom had been on the coroner's jury, testified that they did not observe powder burns on deceased's head or face but they also said they had not looked closely or with the thought of powder burns in mind, and the light admittedly was not very bright and the blood had not been washed from deceased's face. There was some evidence that there was practically no blood on the right side of deceased's face below the wound; other evidence that there were streaks of blood there. Admittedly the part of the head above the point of entrance of the shot was blown away.

Over the objections of defendant the State introduced evidence of certain experiments made shortly before the trial by witnesses who were not and did not claim to be experts, for the purpose of demonstrating the effect, especially as to powder burns, of the near discharge of the gun with which deceased was killed, using shells found in the house. Some of those experiments consisted of discharging the gun against a target made of cotton pasted upon cardboard, the target being placed against a tree and the muzzle of the gun held at distances varying from practically against the target, "as near as we could," to several feet. Others were made by firing the gun at similar distances against small tin tomato cans filled with tomatoes. Others consisted of firing it against the body of a "dressed, picked chicken." Still others were made by laying the gun down on a smooth board and causing it to be discharged, the latter for the purpose of noting the distance of the recoil. Testimony of doctors called by the State indicated that there would be substantial dissimilarity, in the powder burn indications and otherwise, between a cotton covered target placed against a tree and a human skull, especially that of a dark complexioned woman with dark hair, as was the deceased; also that a tin can filled with tomatoes was dissimilar from a human skull and its contents and would probably show a different reaction when struck by the charge from the gun, although it may be observed that when the muzzle of the gun was held close to the tomato can the discharge blew it to pieces as it had done the skull of deceased. The evidence also showed, as would be obvious, that the recoil of the gun would be greater when laid down upon a smooth board than if the

butt were resting upon the bedclothes, probably at an angle from the horizontal position, and especially if held by the hand of deceased for the purpose of discharging it against her head.

As tending to show motive there was some evidence indicating that once or twice, several years previously, deceased had left defendant, remaining away, however, only about a day and night on each occasion; that on Saturday, June 22, she had gone to her mother's intending not to return though she had returned of her own volition; that she carried $2,000 insurance on her life, payable to her husband; and that toward evening of the Sunday in question defendant had proposed to a young man named Fields, about eighteen years of age, that if he, Fields, would kill either defendant's wife or her mother, defendant would give him $1,000 and a Ford car. Defendant had a Ford car and according to Fields' testimony he proposed to get the $1,000 from his wife's insurance. According to Fields' testimony defendant did not explain how he expected to get the $1,000, a sum far beyond his resources, if Fields should kill Mrs. Clay, the mother-in-law, and it was immaterial to defendant which one Fields killed, the reason assigned by defendant being that if the wife were killed he would get his children back and if her mother were killed he would get back both wife and children. Fields was impeached for truth and veracity by numerous witnesses, no witness being called to rebut that testimony as to his reputation.

Defendant in his own behalf testified that his wife had gone to her mother's on Saturday with a sister and the latter's husband and had sent back word that she would not return; that he saw and talked with her there, without acrimony on either side, on Sunday morning, at which time she appeared disinclined to return and he told her that if she did not change her mind he would send her the cow so that she and the children might have milk. Mrs. Clay, a witness for the State, corroborated defendant as to the promise to send the cow, the only part of the conversation she had heard. Defendant further testified that his wife returned home Sunday evening; that that night he and she talked matters over and she became reconciled and agreed to remain; that when they retired he went to bed with the baby, about a year old, in the bed in the northwest corner of the room, and that his wife undressed and lay down across the foot of the other bed in which slept the two older children, expressing the intention of sleeping there as the night was warm; that about midnight he was awakened by the gunshot, discovered that his wife had shot herself, hurried to Payton's room and informed him and then ran to a neighbor's and informed them what had occurred. The latter statement was confirmed by the neighbors whom he aroused and who testified that he seemed greatly agitated. Payton, though held under recognizance as a witness of the State, was not called by either side.

Defendant denied Fields' testimony about the offer to pay him to kill Mrs. Clay or Mrs. Allison. He testified that he remarked to Fields that he would give a thousand dollars if he had it if his wife would stay with him and be contented, which was all he had said to Fields on the subject.

Defendant introduced evidence tending to prove that for several months before her death Mrs. Allison had been despondent and, though not apparently ill, had lost considerably in weight.

There was evidence that while confined in jail defendant gave $80 to a prisoner named Hill for which Hill was to try to induce Fields to change his story, he having told it to the officers as defendant knew. Defendant admitted giving the money to Hill but claimed it was a loan to enable Hill to pay his fine.

There was no evidence of previous difficulty or ill feeling between defendant and his mother-in-law nor, except for the previous short separations mentioned, between defendant and his wife. All the witnesses who testified on the subject said that defendant always treated his wife affectionately and seemed devoted to her. Many witnesses testified that his reputation as a peaceable law-abiding man was good. That evidence was not controverted.

█ I. Appellant contends that his demurrer to the evidence should have been sustained; for which reason and because of his complaint of the admission of the evidence of experiments above noted, we have outlined the evidence rather fully. He practically concedes that if credence can be given to Fields' testimony the State made a submissible case but he argues that Fields was so thoroughly impeached and his testimony was so improbable and so full of contradictions that it is unbelieveable and does not amount to sustantial evidence. To this we cannot agree. With Fields' testimony in the case, if it is entitled to any consideration, there can be no doubt of the submissibility of the case. So far as concerns the impeaching testimony the credibility of Fields' testimony was a question for the jury. As to the contradictions in his testimony, without attempting to set them out in detail, we do not consider them such as to justify us in holding that as a matter of law, they destroy the probative value of his testimony. He repeated his story several times, first to the officers, then two or three times at the preliminary hearing and again at the trial. The contradictions complained of were mostly as to minor details. In its essential features he stuck to his story fairly well. That it sounds improbable, particularly in the statement that defendant expressed a desire to have either his wife or mother-in-law killed without preference as to which, may be conceded. There was also some evidence indicating that Fields bore a grudge against defendant. But all those

considerations affected the credibility and weight of his testimony and were for the determination of the jury. We rule this point against appellant.

■ ■ II. It is urged that the admission of the evidence relating to experiments and the exhibits showing the results of the experiments was prejudicially erroneous. This contention we think must be sustained. The rule as to admissibility of such evidence is thus stated in State v. Bass, 251 Mo. 107, 157 S. W. 782:

"The general rule is that a nonexpert witness will not be permitted to testify to the results of experiments made out of court, but that a witness who is an expert and has made experiments under conditions and circumstances as nearly similar as possible to those in the concrete case, may be permitted to state the result of his experiments made out of court. [Riggs v. Railroad, 216 Mo. 304; Underhills, Cr. Ev. (2 Ed.) sec. 233, p. 422.] Evidence based on experiments, however, should be received with the greatest caution. The cautions to be observed are that unless the experiments are shown to have been made under essentially the same conditions as in the concrete case, the tendency is to confuse and mislead rather than enlighten the jury. [2 Whar. Cr. Ev. (10 Ed.) sec. 783a, p. 1541; Daniels v. Stock, 130 Pac. l. c. 1034.]" [251 Mo. l. c. 120.]

The witnesses who made the experiments in this case were not experts and it is clear from the facts hereinbefore stated that the experiments were not made under "essentially the same conditions" as in the actual case. In the first place, the showing of the absence of powder burns on deceased's face and head was far from satisfactory. The observations were made in a cursory way by lay witnesses not looking especially for such indications and in a poor light. The gun had been fired at an upward angle, the degree of which was not known and which, according to the testimony of doctors called by the State, would affect the extent and discernibility of powder burns *below* the wound. One or more of those doctors testified in effect that if the muzzle of the gun was close to the head and fired at an upward angle most of the powder burn would be *above* the point of entrance of the shot and that while there would be some indication on the skin, at the lower edge of the wound it might and probably would require a careful examination, perhaps by one skilled in such matters, to detect it. The part of the head above the wound, which would have shown most of the powder burns, had been blown away. The evidence showed that powder burn effects would not appear the same and to similar extent upon the human skin in the circumstances of the instant case as upon the cotton covered target used in the experiments. So also as to the effect of shooting against the tomato can as compared with

the human skull, and to some degree at least, we think, as to the experiments with chickens. The experiments to test the recoil of the gun could only have been misleading. It requires no evidence or discussion to show that the recoil would not have been the same if deceased held the gun to her head with the other end resting upon the bed when it was discharged as when the gun lay on a smooth board.

The unreliability and dangerous possibilities of evidence of this character, especially on account of dissimilar conditions, is pointed out in State v. Bass, supra, which see. In Morton v. State (Tex. Crim. App.), 71 S. W. 281, experiments made by firing a pistol at a pasteboard target to note the effect of powder marks in order to show the distance of the weapon from deceased's head at the time of the homicide, were held inadmissible upon similar reasoning. So, experiments upon pasteboard targets made for like purpose were held incompetent in State v. Justus, 11 Ore. 178, in a well-considered opinion citing a number of cases. [See, also, State v. Hyde, 234 Mo. 200, 256, 136 S. W. 316; 12 Am. & Eng. Ency. of Law (2 Ed.) pp. 406-7; Commonwealth v. Piper, 120 Mass. 188; Jim v. State, 4 Hump. (Tenn.) 289.]

III. A witness for defendant, Eva Norman, testified that in 1924, Mrs. Allison in witness' presence attempted to take poison with suicidal intent, which attempt the witness frustrated. On cross-examination she was asked if she had ever been convicted of crime which she in effect denied. This question and answer followed: "Q. Weren't you convicted for shooting your husband? A. If I have been I don't remember it." In rebuttal the State called Harry Howlett, a brother of Mrs. Norman, who, it appears, was not on good terms with his sister. Over defendant's timely objection that the record of conviction, if any, was the best evidence, Howlett was permitted to testify that Mrs. Norman had been convicted two or three times; that "in 1914 she was convicted of murder" in Stoddard County. Defendant's objection was good and should have been sustained. If the well-established rule requiring production of the best obtainable evidence needs justification at this late day the facts in this instance furnish it. As shown by an affidavit filed with defendant's motion for new trial, the facts were that in 1914, in Stoddard County, Mrs. Norman, whose age was not shown but who was then evidently unmarried, had been convicted of manslaughter, not murder, "for killing the man who had seduced her and who was the father of her baby and who refused to marry her," and had been sentenced to two years' imprisonment which she was never compelled to serve. Those facts are shown to have been within the knowledge of the trial judge who allowed and signed the bill of exceptions containing the affidavit. Howlett's

testimony that Mrs. Norman had been convicted of murder, following the question to her about shooting her husband, would naturally be understood by the jury to mean that she had been convicted of murdering her husband. In his argument to the jury, counsel for the State, basing his argument presumably on Howlett's testimony, said: "That blood money is still talking when that woman perjures herself on a material fact and denies her conviction for murder." The admission of Howlett's testimony was reversible error.

■ IV. Appellant charges error in that the court, over his objections, submitted to the jury the offense of murder in the second degree. He contends that under the evidence if he was guilty of any crime it could only have been murder in the first degree and that the submission of second degree murder permitted the jury to compromise and may have produced the verdict returned when the jury was not fully convinced of his guilt.

We are inclined to think the evidence justified instructions on murder in the second degree. No one, unless the defendant, witnessed the killing. A deadly weapon was used upon a vital part of the body, from which, without explanatory or qualifying evidence, a presumption of murder in the second degree may be indulged. If defendant killed deceased and arranged the gun and golf stick to simulate suicide those things might have been thought of as well as executed afterwards to conceal the crime. But in any event the early cases relied upon by appellant to support his contention that it is reversible error to instruct on second degree murder when the evidence tends to show only first degree or innocence are no longer recognized as the law in this State since the enactment of our present statute. ■ Following the statutory mandate, Sections 3563 and 4451, Revised Statutes 1929, we have held in numerous cases that a defendant cannot complain for that he was convicted of a lower degree of homicide than that of which the evidence tended to show him guilty. Reference to a few of the many cases so holding will suffice. [See State v. West, 202 Mo. 128, 138, 100 S. W. 478; State v. Whitsett, 232 Mo. 511, 522, 134 S. W. 555; State v. Barnes (Mo.), 204 S. W. 264, 266; State v. Weagley (Mo.), 228 S. W. 817, 819; State v. Bobbitt, 215 Mo. 10, 31, 114 S. W. 511.] This point is ruled against appellant.

■ V. Instructions 8 and 9 on circumstantial evidence are criticised on the ground that as worded they apply only to murder in the first degree and in effect, if we understand appellant, do not inform the jury that the rule of law therein explained applies equally to either degree of homicide submitted, and that therefore the court should have given defendant's requested Instruction 6D which was so worded

784

as to apply to either degree of murder. We think the instructions given would not likely have been understood by the jury as appellant contends but we suggest that in the event of another trial the instructions on circumstantial evidence be so worded as to obviate the possibility of such misconstruction, and also that the concluding paragraph of Instruction 9, telling the jury that if circumstantial evidence is of such character as to exclude every reasonable hypothesis other than that defendant is guilty "it is entitled to the same weight as direct evidence" be omitted. It is for the jury to determine what weight it will give to the evidence.

Instruction 10, relating to motive and to evidence introduced for the purpose of shedding light thereon refers to "the intent and motive of the defendant in the transaction set forth in the information . . . for which he is now on trial." It is claimed that the instruction as worded assumes that defendant did the killing. It may be subject to that criticism. It should be so modified as not to be susceptible of being so understood by the jury.

VI. It appears that Payton had been charged with the alleged homicide jointly with this defendant in the affidavit filed before the justice of the peace and had been discharged by the magistrate. The magistrate's transcript showing Payton's discharge was introduced by the State. That should not have been admitted. The magistrate's action in discharing Payton was not competent as tending to show that this defendant was guilty, though that evidence was probably harmless in this case since defendant's testimony exonerated Payton.

Other alleged errors complained of in defendant's motion for new trial may not occur again and need not be notified here. For the errors pointed out in paragraphs II and III hereof the judgment of the circuit court is reversed and the cause remanded. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.