THE STATE v. PAUL H. KAUFFMAN, Appellant.—73 S. W. (2d) 217.

Division Two, June 26, 1934.

*S. R. Stone* and *J. B. McFarland* for appellant.

*Roy McKittrick*, Attorney-General, and *Frank W. Hayes*, Assistant Attorney-General, for respondent.

LEEDY, J.—Defendant again appeals from a judgment of conviction of murder in the first degree, and a sentence of death resulting on a retrial following our remand of his case on a former appeal. His previous conviction was reversed primarily because he had not been afforded a reasonably sufficient opportunity to prepare and present his defense, although other alleged errors were examined by the court, and adjudged prejudicial. The sordid facts upon which the case against him rests, and upon which it was submitted to the jury are, in their essentials, the same as those detailed in the opinion written on such former appeal, to which reference is made for a statement thereof. [See State v. Kauffman, 329 Mo. 813, 46 S. W. (2d) 843.] This difference in the facts should be noted: That on the first trial defendant was not called as a witness in his own behalf; whereas, at the last trial he took the stand, and denied having killed and murdered Avis Woolery, the girl whom he had lured from her home by means of a "want ad" which he had caused to be inserted in a local newspaper. He contended he last saw the girl when he left her near Twelfth and Paseo in Kansas City in the afternoon of the day in question following an indecent proposal made by him, which she resented. And he further testified that his confession was obtained by duress, and through mistreatment and brutality on the part of the peace officers. His defense was insanity.

I. The matters most seriously urged for a reversal go to rulings with respect to the panel of jurors before which defendant was tried. The principal complaint, and the one stressed in the oral argument and brief of appellant's counsel, grows out of the following state of facts: On the morning on which the hearing of evi-

dence was scheduled to begin, and after both sides had made their peremptory challenges, and the names of the twelve selected to try the case were announced, and they were in readiness to be, but immediately before being, sworn to try the case, one of the jurors, out of the presence and hearing of his fellows, told the court: "I have a daughter about the age this girl would be if she had lived, and she will graduate from Horner's next month, and I got to thinking about it, and I don't feel the same as I did yesterday, and I felt it was the proper thing to tell you now before we start into the case."

This statement precipitated a lengthy discussion and resulted in an extended reexamination into the qualifications of said juror to sit in the case. The record shows both court and counsel carefully inquired into the situation thus presented. The following excerpts are fairly representative of the range the questioning took, and the character of answers elicited throughout the lengthy examination:

"MR. PAGE: Of course, if this man cannot give a fair and impartial verdict based solely on the evidence and the law in this case we will just have to discharge the whole jury and declare a mistrial and start all over again.

"JUROR HURT: I will go ahead and do it; I will serve.

"MR. McFARLAND: Now, just a minute,—

"MR. PAGE: Wait a minute, I haven't finished. If the man can sit fairly and impartially and listen to the evidence and at the close of the case can fairly and impartially decide the case on the evidence alone, regardless of the fact that he has a daughter the same age as this girl there ought to be no mistrial of this case at this time on that account.

"JUROR HURT: I will do that.

"THE COURT: Did you start to say something, Mr. Stone?

"MR. STONE: I was going to say, if your Honor please, that the selection of this man by the defendant, of course, was based upon his testimony under oath yesterday that he would be unbiased and unprejudiced and if anything has happened since that time, such as looking at his daughter and visualizing her presence here to make him feel that he would not be fair and impartial and unbiased, then we desire to insist that the jury be discharged. I don't believe that it would be fair to our client or to our case to go on under those circumstances.

"Q. (the Court). Well, all that I want to know from this juror is whether he can sit in this case, listen to the evidence, listen to the instructions of the court, and be governed in so far as his verdict is concerned solely and alone by the evidence and the instructions of the court and not take into consideration the fact that he has a daughter and not be influenced or swayed either way, either for the State or for the defendant on account of that fact or any other outside matters in any way, shape or form; if you can answer me

honestly that you can do as the Court has indicated then you are qualified, but if you are going to be swayed or influenced in the slightest by anything other than the evidence and the instructions of the court, then of course you are not qualified to sit in this case. A Judge, in this case you couldn't substitute another man?

"THE COURT: Well, that is not for you to say, you should not take that into consideration. Pardon me, I don't want to be disrespectful, but if you can do as the court has indicated, be governed solely and alone by the evidence and the instructions of the court and not be swayed in the—

"JUROR HURT (interrupting.): Yes, I can do that. . . .

"Q. (the Court). Let me say this to you, that the court does not want you to take into consideration in the slightest any inconvenience the court or any inconvenience the rest of the jury may be put to, or the fact that we cannot substitute another man. That, and I say it respectfully, is no concern of yours and you should not take that into consideration in answering my question. If you cannot sit in this case absolutely fair and impartial, free of any feeling of any kind or character tell me now. A. I can.

"MR. McFARLAND: What was that answer? A. I will.

"Q. (Mr. Page). Mr. Hurt, do you mean by that that anything took place that would cause you to not fairly and impartially listen to the evidence in this case and at the close of all the evidence and after hearing the reading of the instructions of the court and the argument of counsel, that you could not return into this courtroom an unbiased, fair and impartial verdict as to the guilt or innocence of this defendant, based solely on the evidence in this case? A. I can.

"Q. You can do that? A. Yes, sir, I can.

"Q. If the evidence in this case would show that this defendant is innocent, could you acquit him? A. Yes,

"Q. (the Court). And would you? A. Yes.

"MR. PAGE: You may inquire.

"Q. (by Mr. Stone). Mr. Hurt, what the defendant wants and all the defendant wants and all the State wants is a jury composed of twelve fair and impartial men. Now, when you stepped up to the bench a few moments ago there was a doubt in your mind then at that time, was there not, as to whether or not you could be fair and impartial in deciding this case? A. Well, I just seemed to feel— I have thought over this matter and when I looked at my daughter yesterday evening I just thought—there is no question but what I can be fair about it. It just seemed when she came in yesterday evening I couldn't help but think about her, about the same age and—

"MR. McFARLAND (interrupting). Mr. Hurt, don't you think that—

"THE COURT: Wait a minute. Let him finish.

"A. (continuing). —I can go—I know that I can hear—that I can hear the evidence and be entirely fair. There is no question in my mind about that.

"Q. (Mr. Stone). That feeling that came over you last evening when you saw your daughter, was that still in your mind when you stepped up to the court's bench this morning? A. It wasn't only then; you see I was not questioned in detail yesterday and I want you people to know that, but I will be entirely fair. I will go by the evidence and the instructions of the court.

"Q. Is there any doubt in your mind whatever at this time— A. (interrupting). No, sir.

"Q. (continuing). —as to whether you would be swayed or influenced by the mental picture of your daughter in the trial of this case? A. No.

"Q. Don't you believe her picture would come to your mind, wouldn't you visualize her presence here in listening to this evidence and when you are in the jury room deliberating in consideration of your verdict that you might render in this case— A. (interrupting). No.

"Q. (continuing). —to the extent that it might in some degree influence your verdict? A. No, sir.

"Q. (by the Court). Mr. Hurt, I want you to understand this—and let the record show that what is occurring now is without the presence of the other eleven men on the jury and that the conversation had between Mr. Hurt and the court in the first instance was had quietly and out of the hearing of the other members of the jury.

"This is what I want to say to you, Mr Hurt: The examination made by the court and the two lawyers for the defendant and the prosecuting attorney of this county, I want you to understand that you should not be intimidated in any way, shape or form by that examination. A. No, sir.

"Q. What the court has said and what the lawyers have said to you, if it in any wise has intimidated or influenced you either way or swayed you either way, I want you to tell me now. A. No, not at all, Judge.

"Q. You are are telling this court now that you can sit in this case fairly and impartially and be governed solely by the evidence as it comes from the witnesses and the instructions of the court and give this man a fair trial and start into the case with the assumption that he is innocent until the State proves him guilty beyond any reasonable doubt? A. Yes, sir."

The entire examination was characterized by an attitude of fairness on the part of the challenged juror. His very frankness in making the statement quoted weighs heavily against the theory of prejudice advanced by appellant. A less frank person, and certainly one who was, in fact, biased or prejudiced would have been content to

proceed without making any disclosure whatever touching the state of his feelings. The action of the court in the premises, as reflected by the record, indicates a lively interest on its part to protect the defendant in, and guarantee to him, his right to a trial by an impartial jury. It has been aptly said that the trial court stands closer to the source of justice than any other tribunal by reason of the heavy responsibility resting upon a trial judge in the wise exercise of a discretion reposed by law in him alone in matters of the character here under scrutiny. In that connection the rule stated in State v. Brooks, 92 Mo. 542, 5 S. W. 330, is peculiarly applicable. It was there held: ''The rule is well settled that it is the duty of the court to superintend the selection of the jury, in order that it may be composed of fit persons. Large discretion must be confided to the trial court in the performance of this duty. Nor will the action of the court in this behalf be made the subject of review unless some violation of law is involved, or the exercise of a gross and injurious discretion is shown. . . . It is sufficient that the judge is satisfied from his personal knowledge of the jurors; their answers to other questions; their reputation for integrity and intelligence, and his judgment in respect to such qualifications will not be reviewed.''

On the showing made, we think it clear that the action of the court in overruling defendant's challenge, and in refusing to discharge the panel is impervious to the attack made on it, and must, therefore, be sustained.

■ II. The next assignment is that the court erred in refusing to sustain challenges for cause to jurors Davies, Long and McCough, members of the panel of forty-seven held qualified by the court. They were not members of the trial panel, having been stricken off by peremptory challenge. On their respective *voir dire* examinations, it was developed that each, from reading newspaper accounts of the case, had formed an opinion. By one of them, his was described as being ''nothing real definite;'' by another as ''very hazy;'' and by the other as ''after a fashion.'' However, on further examination each swore that, if chosen as jurors, they could and would sit fairly and impartially, hear the evidence and instructions of the court, and be governed in their deliberations by those things alone. Under our statute, Section 3671, Revised Statutes 1929 (Sec. 3671, Mo. St. Ann., p. 3221), and in connection with what was said in the last preceding paragraph, we conclude the jurors were competent. [See State v. Brooks, supra; State v. Poor, 286 Mo. 644, 228 S. W. 810; State v. Davis (Mo.), 7 S. W. 264; State v. Nevils, 330 Mo. 831, 51 S. W. (2d) 47.]

III. We shall next proceed to a disposition of two assignments

together, the points of which are so closely related and interwoven as to make it expedient to so treat them. They are:

"(1) The evidence is insufficient to sustain a verdict of first degree murder" in that it "does not show premeditation on the part of defendant prior to the alleged killing, or that defendant was in a cool state of blood, or that the alleged killing was considered, weighed and pondered upon by defendant, or that the alleged killing was committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, and the death, if any, was accidental, and nowhere in the record of the evidence is the charge in the indictment sustained that the defendant killed the deceased by choking with his hands the throat and neck of deceased."

(2) That the court erred in failing to instruct on the law of murder in the second degree because in defendant's alleged confession the statement was made "In my drunken passion I did not realize she was slowly choking to death. . . . The crime was not premeditated."

■ With respect to the first contention it may be said that all of the elements mentioned are not necessary to sustain the conviction. We think it too plain for argument that the State's case proceeds upon the theory, and is abundantly sustained by the proof, that this was a homicide committed in the attempt to perpetrate rape, which by our statute, Section 3982, Revised Statutes 1929 (Sec. 3982, Mo. St. Ann., p. 2778), is declared to be murder in the first degree, and under instructions properly submitting the case, the jury would be authorized in returning only one of two verdicts, namely: conviction of murder in the first degree, or an acquittal. In construing the statute just mentioned, this court, in State v. Moore, 326 Mo. 1199, 33 S. W. (2d) 905, held: "Anciently, at common law, no degrees of murder obtained, and all murders were punishable by death. [13 R. C. L. 755.] Our statutes, however, have classified murders into first and second degree, respectively, and the distinction that obtains generally between the degrees is the element of deliberation. The necessary elements in second degree murder are premeditation, willfulness, intent and malice aforethought. To these, in first degree murder, the element of deliberation must be added. But, if the murder is committed while committing or attempting to commit one of the crimes named (in the statute, Sec. 3982, supra), the proof of that fact deletes the necessity of proof tending to show deliberation, *for the statute renders such a state of facts the equivalent of deliberation.*" [See, also, State v. Hart, 292 Mo. 74, 237 S. W. 473, and cases there cited.] So the offense would not have been reduced to second degree murder, even if, instead of disavowing his confession, he had from the witness stand made the statements attributed to him that in his drunken passion he did not realize she was slowly choking to death, and that the crime was not premeditated. Mani-

festly there was no occasion for the giving of an instruction on second degree murder, and the action of the court in refusing to so instruct was proper, and is, accordingly, upheld.

IV.   This brings us to a consideration of the assignment that "The court erred in giving instruction No. 3 because (a) there was no evidence that the defendant had clasped and choked the throat of said Avis Woolery with his hands; and (b) the said instruction erroneously assumes that the defendant did murder, choke and strangle Avis Woolery, which assumed facts were one of the disputed parts of this case; and there was no evidence to sustain that part of the instruction that the defendant did clasp and choke the throat of Avis Woolery with his hands."

The instruction complained of submitted the case on the theory of a homicide committed in the attempt to perpetrate rape.  As pointed out in the last preceding paragraph, the submission on that theory, under the evidence, was proper and appropriate.   The complaint above set forth is substantially the same as the one urged against the State's main instruction on the former appeal.   We are satisfied the point was then correctly decided, and so adhere to that ruling, and in disposing of the point on this appeal adopt the language of Commissioner COOLEY on such former appeal, as follows:

"Complaint is made of the main instruction, No. 2, which submits the case on the theory of deliberate murder.   The complaint is that the instruction directs a verdict of guilty if the jury finds that defendant 'did clasp and choke the throat and neck of Avis Woolery with his hands and by other means, if any,' etc., and thus and thereby choked and strangled her to death, whereas it is contended that the evidence does not authorize a finding that defendant choked deceased with his hands. In defendant's written confession he said that as he held Miss Woolery his elbow was resting on her throat. It was in that connection he added: 'In my drunken passion I didn't realize she was slowly choking to death.'   A witness testified that in describing verbally how he killed deceased he said that in trying to hold her down he had his arm across her throat.   It is not claimed that the evidence fails to show that defendant used his hands in the struggle with deceased, and that he choked and strangled her to death, but only that it does not show that he clasped her throat with his hands.   We think this criticism of the instruction is hypercritical.   Defendant could not have been prejudiced by the inaccuracy complained of."   [State v. Kauffman, supra, l. c. 848.]

■   V.   The next assignment alleges error in that the court permitted Dr. Pottorf, a State's witness, to testify out of order.   The gist of the complaint is that the court wrongfully allowed the State, at an improper time, to introduce evidence, not properly rebuttal,

after the State had closed its case in chief, and while testimony on the part of defendant was in process of being heard. The Attorney-General's brief correctly states the facts with respect to this incident of the trial, which we adopt, as follows: ''The defendant had put in testimony covering records of the Veterans' Bureau. The appellant had brought in a great number of records and offered some of them in evidence, and the State asked permission of the court to put on Dr. Pottorf, the medical examiner who made the records, for the purpose of identifying the documents.'' It is well-settled that all such matters rest within the sound discretion of the trial court, and in the absence of a showing of an abuse of discretion, its rulings thereon will not be disturbed. [See State v. McGuire, 327 Mo. 1176, 39 S. W. (2d) 523; State v. Miles, 199 Mo. 530; 98 S. W. 25.] No such required showing is here made, and we are unable to say that defendant was in any manner prejudiced by the ruling complained of. The point is ruled against defendant.

VI. We have taken up, considered and disposed of all assignments developed in the brief and argument of appellant's counsel. We have also examined into such of the other grounds of the motion for new trial as present anything for review, and find them without substance. We have likewise examined the record, and find it without error. The indictment is in approved form, and the verdict and judgment are regular and sufficient.

Messrs. J. B. McFarland and S. R. Stone, counsel appointed by the court below, have represented defendant with exceptional zeal and ability. They have safeguarded every right secured their client by the Constitution and laws of the land, and they are to be commended for their fortitude and industry in discharging a duty to which all members of the Bar are subject merely by reason of their right to practice.

The evidence in the case satisfies us, as it did the two juries before which he was tried, that defendant is guilty of the atrocious crime of which he stands convicted. It is not without precedent that the offense took the form of bestiality, and so becomes all the more revolting to natural instincts. The gruesomeness and horror of the circumstances under which it was committed are shocking to the sensibilities, and terrifying alike to his luckless victim and the community in which it unfortunately occurred. He not only failed to establish his defense of insanity, but on the contrary it was made to appear that defendant knew, was conscious of, and appreciated the difference between right-acting and wrongdoing. The judgment ought to be affirmed, and we so order, directing that the sentence as pronounced be executed. *Tipton, J.,* concurs; *Ellison, P. J.,* absent.

Date of execution set for Friday, June 29, 1934.