STATE of Missouri, Respondent,

v.

Michael Ray JEWELL, Appellant.

No. 55719.

Supreme Court of Missouri,
Division No. 1.

Dec. 13, 1971.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Special Asst. Atty. Gen., St. Louis, for respondent.

J. Arnot Hill, Kansas City, for appellant.

HIGGINS, Commissioner.

Michael Ray Jewell, indicted for murder, first degree, was convicted by a jury of murder, second degree. The jury also assessed his punishment at twenty-five years' imprisonment, and judgment and sentence were rendered accordingly. §§ 559.010, 559.020, 559.030, V.A.M.S.

The trial posture of this case was delineated by verdict-directing instructions on murder, first degree, felony-murder, first degree, murder, second degree, manslaughter, innocence, and by a converse instruction on defendant's theory of the case under which defendant could not be found guilty of any crime unless the jury first found that he participated in burglary of the rooms occupied by the murder victim.

Appellant places the case in the same posture here by charges of error in submitting the case without sufficient evidence and with respect to the converse instruction.

Appellant's principal contention, Point I, is that "the court erred in submitting to the jury the offense of murder in the second degree, there being no evidence to support a conviction of that offense" and thus "violated due process of law." In presentation of this point appellant asserts that he "does not concede there was sufficient evidence * * * to convict him of murder in the First Degree under the Felony Murder doctrine and if that was done in the argument on this point it was done for the purpose of argument only." Accordingly, the evidence will be stated in sufficient detail to demonstrate a case of felony-murder, first degree, and of murder, second degree.

Warren Shireman, on July 11 and 12, 1968, was the owner of Hagerwood Inn, 6135 Prospect, Kansas City, Jackson County, Missouri. His business was located on the first or ground floor of a two-story building. The second floor was a seven-room apartment, part of which was used as an office and housing for a safe, with the remainder being occupied by Mr. Shireman's son, Terry S. Shireman. The business also made use of a basement which had doors connecting to the first floor. There was no ingress to the second floor from the first floor; ingress and egress to and from the apartment were accomplished via an outside stairway. At 8:00 a. m., July 12, 1968, Mr. Shireman arrived at the Inn, learned from the bartender that the premises had been burglarized, and found that his coin-operated pool table, "jukebox," and cigarette machine had been broken and money removed from them and from a drawer. He went to the front door and upstairs to see if his son had heard anything. "I went to his room, and he wasn't in bed, and I hollered for him and I couldn't find him, and I went back in his room and I saw blood on the bed, and then I just kept looking around until I found him on the other side of the bed * * *. On his back on the other side of the bed, and the bed was put over him. * * * The bed had been put over his feet. His feet were under the bed, but tied. He was what they called mummy-wrapped in a

piece of bedclothing, and his hands were tied," with neckties. "The whole bed had been lifted and placed over his feet." His face was "beat to a pulp." He described his son as age 20, "five-foot-ten, weighed 165, 170 pounds," in good physical condition. He also noted that a sheet had been placed over the front window of the upstairs office. The window was "right in front of the safe, which was in a closet." Some of his son's clothing was missing, as were "some odds and ends of change * *." He called the police when he first found the burglary and called again after discovering his son. Among those who arrived shortly was Kenneth Shireman, M. D., uncle of the deceased.

Dr. Shireman saw his nephew lying as described by the boy's father. "His face was very badly beaten, quite swollen. He had foaming blood coming from his mouth and nose that indicated * * * death had already come over him."

Angelo Lapi, M. D., chief pathologist at St. Mary's Hospital and deputy coroner for Jackson County, performed an autopsy on the body of Terry S. Shireman at 12:30 p. m., July 12, 1968. Excluding head injuries, he saw two marks on the wrists. "They were grooves, on each wrist." He found deceased to be "a very well developed and muscular young man * * *. The face, neck and head were very much swollen and discolored because of many bruises in the scalp, particularly on the left side in the temporal area * * *. Both cheeks, and the lips and mouth on the inside showed some very jagged cuts." He described the blows to cause such injuries as "Blunt impacts. Multiple blunt impacts" which could have been caused by a hand or a fist. Such blows caused injury to the brain. " * * * the brain was pretty badly beaten to a pulp, because it had all kinds of bruises, just like the external tissues. * * * There was also some hemorrhage under the covering of the brain, * * * when the brain is bruised extensively like this one was, it swells up * * but there's no place for it to go because of

the skull * * * and so the result is that the bottom of the brain, as in this case, goes —the only place it can go, and that's the little opening at the bottom of the skull where the spinal cord comes out. * * * And it jams, it laterally jams or ruptures, through into that opening, * * * and when that gets jammed down in there, then respiration stops. * * * the heart continues to beat until it uses up all the available oxygen in the circulating blood, which is a matter of maybe six or ten minutes, and then it stops, too." In his opinion, "he died from brain injury due to multiple blunt impacts to the head." He had been dead at the time of autopsy about ten or twelve hours.

Sergeant John Cowdrey of the Kansas City Police Department went to the scene of the homicide between 8:00 a. m. and 9:00 a. m., June 12, 1968. He "found the rear door to the upstairs had been apparently forced open. Glass was broke out of the door. In the bedroom located along the south part of the apartment was the body of the deceased." He noted the deceased lying in the condition described by Mr. Shireman, and "The room gave all appearances of having been gone through. The personal items of the deceased were strewn about the room. * * * The victim's billfold was inside the doorway, personal items that had been in the billfold were strewn about the floor. The dresser drawers had been opened." The room with the sheet over the window also showed evidence of having been prowled.

Detective Robert Penson of the Kansas City Police Department also went to the scene and to the second-floor rear door at 6135 Prospect, and "found the window glass broken from without * * * which would allow a person to reach in and open the door from the inside."

Officer Billy Trollope investigated the burglary in the Hagerwood Inn area. He found that the coin-operated machines had been forcibly pried open. There were pry marks on a rear door which led from the lower basement level parking lot up a flight

of steps into the tavern. "This door was apparently not used too often and had been nailed up, and on the inside another door had been propped up * * * there were signs to show that the door had been pushed inward at the bottom, and the wooden frame was pulled loose from the concrete blocks, permitting an opening."

Detective Earl Horner interrogated Michael Ray Jewell July 31, 1968. "He stated that he wasn't going to fry for anybody, and that he was in the Colony Bar at about midnight * * * that the person he knew as Pat Holderby and another man he knew as Phil [Phil Cannon] * * * came to the bar and got him, the three of them went to the Hagerwood Inn at 6135 Prospect, in Philip Cannon's car * * * that he had [and] Phil played pool * * while Pat Holderby sat at a booth and drank beer, · that Mrs. Shireman said the place was closed, and they walked to their car, which was parked in the south parking lot of the tavern, and while en route, why, Pat Holderby and Phil made this statement to the effect, 'Let's make this place, let's make some money.' He stated that they got in the car and parked where they could watch, and that they waited until three persons had left the tavern. Mrs. Shireman, the barmaid, and another person he did not know. And after they left, why, he and Phil got out of the car, and Phil had a crowbar, and a large screwdriver, and they walked up to the bar and went to the rear, and he and Phil made the agreement that Phil would break in and he would act as a lookout * * *. Holderby stayed in the car. * * * he stood on the southeast corner of the tavern and Phil went to the back door of the tavern and pried on the door but couldn't get in, and he and Phil then forced the rear basement door open and Phil went inside and he was inside for ten to 15 minutes. He came out and he had a sackful of change. He stated that he took the change back to the car, gave it to Pat Holderby, and he came back to the rear of the tavern, that Phil told him that he thought there was some money upstairs and 'sometimes a man stays up there.' He

said * * * Phil went up the outside steps, broke out the rear window of the door and went inside. He stated he was in there about five to ten minutes. He came down the steps and he made the statement, 'There was some old man up there, I tied him up, I jumped him, I think he's dead, let's get the hell out of here.' They went to the car * * * and they went to Phil and Pat Holderby's apartment * * * and they slept there all night and the next morning Holderby took the change that they got * * * and cashed it in for bills, and he got thirty to forty dollars of the money, that they heard about it on the news the next day * * *." Jewell said his duties were to act as a lookout when Phil went upstairs.

Detective Horner also interrogated Philip Cannon who he described as "five-foot-nine, 150, 155 pounds." At trial Phil Cannon was in the Wyandotte County jail.

Detective Vernon Wilson also participated in the interrogation of Michael Ray Jewell July 31, 1968. In particular, with respect to going upstairs at 6135 Prospect, Jewell "stated he did not go upstairs because he was the lookout who was to stand at the back door while Cannon · went upstairs."

George Patrick Holderby stated his presence at Hagerwood Inn at 6135 Prospect on July 11 and the early morning hours of July 12, 1968, in company with Phil Cannon and Mike Jewell. They left the tavern when it closed, "drove a short distance and drank a couple of beers and came back * * * for the purpose of burglarizing the Hagerwood Inn. * * * They left the car and went back to the tavern. I waited in the car." They were gone "it would be probably 15 minutes, maybe 20 minutes, maybe more than that, when Mike came back." He had "a bag of change" which he left in the car. "He said that 'We're going upstairs' "; at least, that is the impression he got. He was not gone long the second time and came back with Cannon. Jewell "was pretty upset about something that happened up there * * I couldn't tell you exactly what he said, but

it was something like they had beat a guy up there and * * * he was afraid he might not live or was not alive." Both Cannon and Jewell were talking to that effect. He got the impression "they" had beaten the victim with their fists. He knew Cannon as a man who "could handle himself in the street, I've seen him do it before. I don't know how powerful he was." With respect to whether his impression was from information Jewell got from Cannon, Holderby did not "think so, because—well, now, I don't think so, because they was both —it was like Phil might say, 'We did this,' and he might say 'We did that,' and neither one of them blamed the other one. I'm not saying either one of them did it or one did it and the other one didn't, but neither one of them blamed the other one. Both of them said, 'We did this,' and, 'We did that.' "

Norma Jean Shireman, mother of Terry, tended bar at Hagerwood Inn, July 11, and early morning July 12, 1968. She saw defendant, Holderby and another man in the bar, and they left at 1:30 a. m., closing time. She last saw her son about 10:00 p. m., when he came downstairs to eat. Her son was an assistant golf professional at Meadowbrook Country Club. He was about "five-foot-ten * * * he was very broad-shouldered, had very large arms and shoulders and legs, for golf, swimming, and diving activities." .

Defendant's version was that he had been drinking with Cannon and Holderby at the Hagerwood Inn in the early morning, July 12, 1968, and became half drunk; that the burglary was planned by Cannon and Holderby and he agreed to join them; that he assisted Cannon in breaking the tavern door but did not go in; that Cannon did go in and came out with a sack of change which he took to the car expecting Cannon to follow; that he went back to see what had happened to Cannon, heard a glass break and saw Cannon going in the back door on the second floor; that he waited for Cannon and did not go upstairs; that he was not then acting as a lookout and had not told Holderby "we're going upstairs."

He denied participation in that part of the burglary that took place upstairs; his only purpose in going back was to see what had happened to Cannon.

Section 559.010, V.A.M.S., provides that "Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, and every homicide which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree"; Section 559.020 provides that "All other kinds of murder at common law, not herein declared to be manslaughter or justifiable or excusable homicide, shall be deemed murder in the second degree"; and Section 559.030 provides that "Upon the trial * * for murder in the first degree, the jury must inquire, and by their verdict ascertain, under the instructions of the court, whether the defendant be guilty of murder in the first or second degree; and persons convicted of murder in the first degree shall suffer death, or be punished by imprisonment * * * during their natural lives; those convicted of murder in the second degree shall be punished by imprisonment * * * not less than ten years."

So-called felony-murder is not a separate and distinct offense under Section 559.010; it is but one means of committing first-degree murder. See State v. Bobbitt, 215 Mo. 10, 114 S.W. 511, 517, where felony-murder by arson was proved, and submission and conviction of murder, second degree, was approved and affirmed. The distinction generally made between the degrees of murder is in the presence or absence of the element of deliberation. The elements of second-degree murder are the premeditated, wilful, intentional taking of human life with malice aforethought; first degree murder requires the additional element of deliberation. State v. Davis, Mo., 400 S.W.2d 141, 145 [1, 2]; State v. Kauffman, 335 Mo. 611, 73 S.W.2d 217, 220 [4, 5]. And if the killing is committed during the actual or attempted perpetra-

tion of one of the felonies enumerated in Section 559.010, proof of the underlying felony stands in lieu of and is the equivalent of the necessary malice, premeditation, and deliberation and is tantamount to proof of first-degree murder. State v. Glenn, Mo., 429 S.W.2d 225, 236 [23]; State v. Burnett, 365 Mo. 1060, 293 S.W.2d 335, 343 [13]; State v. Bradley, 361 Mo. 267, 234 S.W.2d 556, 558 [1]. Consequently, whether a killing amounting to murder, first degree, is committed in such manner that proof of its elements is constructively presumed, as in felony-murder, rather than directly, it is nonetheless murder, first degree, and necessarily embodies murder, second degree, as an included offense. § 556.230, V.A.M.S.; State v. Varner, Mo., 329 S.W.2d 623, 632.

■ There is no question under the statement of this case that a jury reasonably could find defendant to have participated in burglary of the Hagerwood Inn and upstairs apartment at 6135 Prospect, Kansas City, Missouri; and that during such burglary (or burglaries) a homicide was committed. Accordingly, under the foregoing authorities, the evidence demonstrates a case of murder, first degree, and *a fortiori,* a case of the included offense of murder, second degree.

In these circumstances there is no merit to the asserted denial of due process, c. f., Thompson v. Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654; Johnson v. Florida, 391 U.S. 596, 88 S.Ct. 1713, 20 L.Ed.2d 838; and, under Criminal Rule 26.06, V.A. M.R., "A defendant * * * shall have no just cause for complaint because * * * the evidence showed or tended to show him to be guilty of a higher degree of the offense than that of which he was convicted." Note also that under Section 556.220, V.A. M.S., "Upon indictment for any offense consisting of different degrees * * * the jury may find the accused not guilty of the offense charged * * *, and may find him guilty of any degree of such offense inferior to that charged * * *; and any person found guilty of murder in the second degree, or of any degree of manslaughter, shall be punished according to the verdict of the jury, although the evidence * * * shows him to be guilty of a higher degree of homicide." State v. Nibarger, Mo., 391 S.W.2d 846–848 [1]; State v. Tolias, Mo., 326 S.W.2d 329, 335 [13]; State v. McQuerry, Mo., 406 S.W.2d 624; State v. Garrett, Mo., 282 S.W.2d 441, 443; State v. Allison, 330 Mo. 773, 51 S.W. 2d 51, 55; State v. Morrow, Mo., 188 S.W. 75, 76; State v. Bobbitt, supra; and see also Section 556.230, V.A.M.S., that "in all * * * cases * * *, the jury or court trying the case may find the defendant not guilty of the offense as charged, and find him guilty of any offense, the commission of which is necessarily included in that charged against him."

Cases by which appellant would support his position differ in posture to the extent they are not in point: In State v. Sykes, Mo., 436 S.W.2d 32, appellant, found guilty of murder, first degree, argued it was plain error for the court to have failed to give an instruction on murder, second degree, and the question of an instruction on murder, second degree, in a felony-murder situation was never reached; and in State v. Thomas, Mo., 440 S.W.2d 467; State v. Taylor, Mo., 421 S.W.2d 310, and State v. Glenn, supra, the complaint was a charge of error in *refusing* to instruct on murder, second degree, in a felony-murder case.

Appellant's only complaint with respect to the instructions is his Point II charging error in refusal of his converse Instruction No. B, which read: "The Court instructs the jury that even if you find and believe from the evidence that the rooms located on the 2nd floor of a building located at 6135 Prospect, Kansas City, Missouri, immediately above a business known as the Hagerwood Inn were burglarized on or about the 12th day of July, 1968, and that one Terry S. Shireman was assaulted and received a mortal wound causing his death you will not find the defendant, Michael Ray Jewell, guilty of any crime, unless you further find and believe from

the evidence beyond a reasonable doubt that defendant participated in the burglary of said 2nd story rooms even though you find and believe from the evidence that defendant participated in the burglary of the Hagerwood Inn located on the ground floor of the said building."

Instead, the court presented defendant's converse theory by Instruction No. 7, which read: "The Court instructs the jury that even if you find and believe from the evidence that the rooms located on the 2nd floor of a building located at 6135 Prospect, Kansas City, Missouri, immediately above a business known as the Hagerwood Inn, were burglarized on or about the 12th day of July, 1968, and that one Terry S. Shireman was assaulted and received a mortal wound causing his death you will not find the defendant, Michael Ray Jewell, guilty of any crime, unless you further find and believe from the evidence beyond a reasonable doubt that defendant participated in the burglary."

 Appellant is, of course, entitled to a converse instruction, and it is error not to give one if defendant so requests by tender of an accurate converse instruction. State v. Chevlin, Mo., 284 S.W.2d 563. However, defendant's right, and the court's duty, to give such an instruction are fulfilled if the court refuses defendant's tendered instruction and gives, instead, its own instruction covering defendant's theory. State v. Niehoff, Mo., 395 S.W.2d 174. Comparison of refused Instruction No. B and given Instruction No. 7 demonstrates not only that they are substantially the same, but also that Instruction No. 7 adequately and favorably presented defendant's converse theory.

By Point III appellant charges error with respect to the state's argument. The complaint goes to these excerpts from the closing argument of the prosecuting attorney:

"MR. COX: It's going to be rather unusual, when Mr. Cannon's trial comes up, I can hear Mr. Cannon there, 'No, sir, I didn't go upstairs, Michael Jewell went upstairs, and when Michael Jewell came down he told me he killed a man and when we went back to the car, that's what happened.' MR. HILL: If the Court please, this is an improper argument. And I move it be stricken. MR. COX: Proper argument. He's indicated that Cannon was the one and I'd like to make reference the other way.

"THE COURT: The objection will be sustained.

"MR. HILL: Is the Court—I asked that the jury be instructed to disregard his statement.

"THE COURT: The jury will disregard those statements.

"MR. HILL: I further ask for a mistrial, Your Honor.

"THE COURT: The motion will be denied.

"MR. COX: Holderby. Patrick Holderby. Of course, what would happen to Holderby if he goes to the penitentiary? He'll be a dead man within ten days. A dead man within ten days.

"MR. HILL: If the court please, I object to him arguing outside the evidence, speculating on what would happen to Holderby if he were sentenced to the State Penitentiary.

"THE COURT: The objection will be overruled.

\* \* \* \* \* \*

"[MR. COX]: I was sort of amazed at Mr. Hill's description as to what went on up there on that second floor. Glass broke, accosted by the victim, started beating the victim, tied him up, threw him on the bed, that's how the blood got on the pillow, and then they put the bed over him. That's rather curious, as to where the information came from, because there's been no evidence as to how it happened, whether they were met at the door by the victim or whether the victim was in bed. \* \* \*

MR. HILL: I object to this as being improper argument. He's trying to imply that my client has told me what occurred there. MR. COX: Mr. Hill made those statements, Your Honor. MR. HILL: Reasonable inference from the conditions found up there.

"THE COURT: The objection will be overruled."

Appellant asserts that the state thus "told the jury that defendant had confessed the homicide to his counsel, that defendant must have committed the crime, otherwise, his counsel could not reconstruct what occurred on the second floor and has indicated that defendant is such a dangerous man that he would kill the witness Holderby * * * after * * * arrival at the State Penitentiary." Appellant would support his argument by State v. Tiedt, 357 Mo. 115, 206 S.W.2d 524; State v. Mosier, Mo., 102 S.W.2d 620, and State v. Lewis, Mo., 443 S.W.2d 186, which reversed convictions on account of arguments deemed unfair and inflammatory.

■ The authorities recognize, of course, that questions of the propriety of oral argument are addressed to the discretion of the court; and a reversal on such ground occurs only upon abuse of such discretion. Defendant sought to defend and argued on the theory that Cannon alone burglarized the second-floor apartment at 6135 Prospect and killed Terry S. Shireman, and that defendant's version should be accepted over that of eyewitness Holderby because he, too, was a professional burglar. Under the circumstances of this case, it may not be said that the court abused its broad discretion, State v. Morton, Mo., 444 S.W.2d 420, 426 [13], in permitting the retaliatory argument made by the state.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HOLMAN, P. J., and BARDGETT, J., concur.

SEILER, J., concurs in result in separate concurring opinion filed.

SEILER, Judge (concurring).

I concur in result. Under defendant's converse (either the one given or the one requested) the jury was required to find he participated in the upstairs burglary, which would mean first degree felony murder. However, there was evidence in the case from which the jury could have found common form second degree murder and an instruction was given to that effect, so I do not see where defendant has any ground for complaint about his second degree conviction.