STATE OF MISSOURI, Respondent, v. ROY MISSEY, Appellant, No. 41803—234 S. W. (2d) 777.

Special Division Three, December 18, 1950.

*Earl E. Roberts* for appellant.

*J. E. Taylor,* Attorney General, and *Richard H. Voss,* Assistant Attorney General, for respondent.

[778] VANDEVENTER, J.—On the 22nd day of October, 1948, the Prosecuting Attorney of Crawford County filed an information against Edgar Coffman and Roy Missey, charging them with a violation of Sec. 4462, Mo. R. S. A. They were charged with being Habitual Criminals (Sec. 4854, Mo. R. S. A.) and that on the

"16th day of May, 1948, in the County of Crawford and State of Missouri, the said Edgar Coffman and the said Roy Missey, one red, with white-face, calf of the value of $40.00, the property of Oscar Kimberlin, then and there being, unlawfully and feloniously did kill with intent then and there feloniously to steal and convert to their own use the carcass of said calf, * * *."

The information follows the words of the statute and is sufficient. (Sec. 4462 Mo. R. S. A. State v. Spidle, 342 Mo. 571, 116 S. W. (2) 96. State v. Hadlock, 316 Mo. 1, 289 S. W. 945). The verdict and judgment are in proper form. (State v. Boes (Mo.) 262 S. W. 1019. Sec. 4102 Mo. R. S. A.)

They were tried, convicted, and each of them given a sentence of three years in the State Penitentiary. After the appeal was taken, Edgar Coffman died and the case is now here with only Roy Missey as appellant.

The evidence on behalf of the State showed that on the 16th day of May, 1948, which was Sunday, at about 12 o'clock noon, defendants asked one Marion Gregg to take them in his automobile from his home across Campbell Bridge and to the Cedar Grove Schoolhouse, a distance of about 3½ miles. They left Gregg's home about 12 noon and arrived at Cedar Grove Schoolhouse about 12:30. Each of the defendants was carrying a gun, small in size. Relative to the weapons on direct examination, Gregg testified:

"Q. And did they have any guns with them? A. Yes.

"Q. What kind of guns were they? A. I couldn't say. They was just small fire arms.

"Q. Small rifles? A. Well, I didn't pick them up.

"Q. Well, they had long barrels, didn't they? A. Yes.

"Q. Did they look like shotguns or rifles? ·

"A. Well, just what I say, they was small firearms; they could have been little shotguns and shorter big ones. I would say small firearms.

"Q. Well, what would you say,—were they shotguns or rifles?

"A. Well, I would say rifles."

On cross-examination:

"Q. If those guns were shotguns they were '20' or—

"A. I just say small caliber guns; they looked like rifles to me.

"Q. You wouldn't say that they were not shotguns?

"A. No, I wouldn't say they wasn't.

"Q. But you did think they were rather small guns?

"A. I would say small caliber gun."

Upon arrival at Cedar Grove Schoolhouse, defendants got out of the car and Gregg returned to his home after promising them to come back and get them about 5 o'clock. They told Gregg they were going [779] hunting, he last saw them going on down the road in an easterly direction. When Gregg came back after them shortly after 5 o'clock, he brought his wife, who rode with him in the front seat of the car. The two defendants rode in the rear seat. Gregg did not notice that they were wearing wet or bloody clothing, neither did he notice the back seat being wet after they had left the car. Upon arriving at Gregg's house, defendants set their guns on the porch and after visiting for 15 or 20 minutes, left without taking the guns with them. The next morning when Gregg started to work, the guns were still sitting on the porch but when he returned home about midnight the guns were gone. He did not know who had taken them. Gregg testified that defendants did not say they were hunting wolves.

On this same afternoon, about 3:20 o'clock, Oscar Kimberlin, who lived about 1¼ miles east of the Campbell Bridge, was rounding up his stock near the Cedar Grove Schoolhouse and he found the hide of a calf stretched out, lying on the ground with the head, feet and part of the legs from the hocks and knees down. The intestines were also lying nearby. He examined the head and hide and by a mark on the ear identified the find as remnants of one of his calves. He noticed where something had been dragged from where the hide was found to Brazeal Creek, which was nearby, and the footprints of two men. He went down to the creek and discovered the skinned and opened carcass of his calf submerged in the still part of the cold water, which was about waist deep. The carcass was still warm. Apparently the tracks crossed the creek for they could be seen emerging from the water on the opposite side. A man crossing the stream there would have gotten wet to his waist. There was no boat there or other means of crossing except wading. The tracks seemed to have been freshly made. While Kimberlin was watching the calf, two youngsters came by and one of them had a gun, a 22 calibre. They had been shooting with a rifle some distance away. He immediately notified the Highway Patrol about finding his calf and Patrolman Arnold came to investigate. There was a hole in the calf's head as if a small calibre bullet had entered one side and emerged on the other. They found no bullet. The value of the calf was about $70.00. Before Kimberlin found the hide and carcass, he had salted his cattle at a shed between the Cedar Grove Schoolhouse and the place where the hide and carcass

were found. This was about 200 or 300 yards from the creek. While at the shed, he had called his cattle.

Two days later the two defendants were arrested and questioned by the officers regarding the Kimberlin calf. They denied having been in that vicinity on Sunday afternoon, denied having been together or having ridden to the Cedar Grove Schoolhouse with Gregg. Missey said he saw Coffman at a distance only, Sunday afternoon, loading logs. They were taken to the jail at Union, Missouri. There Trooper Arnold questioned them again for about two hours. They were then put in separate but adjoining cells with a solid wall between. The barred doors faced on the corridor, side by side, and they talked through the doors and ''around'' the partition. A microphone was hidden near their cell doors, which was connected by wires to earphones in a room adjoining the sheriff's office on the floor below, and by which defendants' conversation could be heard. They talked to each other and notes were made of their conversation by Trooper Arnold who was stationed in the room adjoining the sheriff's office and listened to them through the earphones. That conversation, as testified to by Officer Arnold, was as follows:

''A. And Coffman next said, 'Did you tell him you went anywhere with Gregg?' Missey stated, 'No, sir'. Coffman stated, 'That's the time; if we don't talk too much we will get out of this.' Missey stated, 'I am afraid Gregg talked; they likely to pull some rough stuff.' Coffman stated 'I would like to get to work by Friday anyway'. Missey stated, *'I wish I knew where he went today, likely Rolla'*. Missey stated, 'We can get Earl to defend us for $500.00'. Coffman stated 'I hope so'. Missey stated, *'Did he ask you about that Sullivan stuff?'* Coffman stated, *'No, I told that Patrolman* [780] *I hadn't been there for two years, and that is the truth.'* Missey stated, 'Did they get them prints of them shoes?' Coffman: 'Yes, that is the only thing they got on us'. Missey stated, 'They didn't get that bullet, that went on through.' Coffman stated 'We will just say what we said and that's all'. Coffman stated, 'Well, I believe we ought to go to sleep, what do you say?' Missey stated, 'Yes.' ''

Upon objection, the italicized portion was stricken out and the jury instructed to disregard it.

The defendants had been brought to the jail at Union before midnight. Trooper Arnold had had them in custody since 5 o'clock and at the jail had placed them in cells about three minutes before they had the conversation which he overheard. He was familiar with their voices and recognized them while listening with the earphones. He had told defendants that he had found footprints near the place where the calf was killed and he was going to make plaster casts of them.

Carrick Mercer, a witness for the State, who lived between the Campbell Bridge and Cedar Grove School, on Sunday afternoon— the day the calf was killed—saw defendants go towards the school in a car with Gregg about two o'clock and later about 3 or 3:30 o'clock, Gregg came back by himself. Still later that same afternoon, Mercer saw Gregg and his wife go by in an automobile towards the school and return with the defendants in the car. There were wolves usually in that neighborhood.

Evidence was also offered to show that Coffman had been convicted of forgery in Franklin County in August, 1937, and it was admitted that he had been convicted of grand larceny in 1940 in Crawford County and was sentenced to two years in the penitentiary. Both of these sentences had been served, less good time, and he had been discharged. It was also admitted that defendant Missey, in October, 1933, had been convicted and sentenced to three years in the penitentiary for arson, second degree, had served his time and had been discharged.

Both defendants testified. They stated that on the afternoon of May 16th, they went to Cedar Grove Schoolhouse with Gregg, and from that point went north, that each of them had a shotgun, that they were going wolf hunting as Coffman had heard some young wolves over in that vicinity a few days before. They had no dogs and killed no wolves. They denied that they had rifles and denied having killed and skinned the calf in question. They said they were never east of Cedar Grove School. Coffman said he borrowed his shotgun from Preston Missey.

Mrs. Gregg, for the defendants, testified that on their return trip from the schoolhouse, on Sunday afternoon, neither defendants' clothing nor the back seat was wet. She and her family went to the show that evening and she heard no complaint about the back seat being wet.

Carrick Mercer, Jr., testifying for the defense, said that he met Coffman on the morning of the 16th of May, and that he was carrying a shotgun.

Preston Missey, a defense witness, and a cousin to defendant Missey, testified that Coffman borrowed his shotgun, which was twelve gauge about 8 o'clock on the morning the calf was killed. At the close of the State's case and at the close of all the evidence, demurrers were filed and overruled.

Appellant has filed no brief but we must, nevertheless, examine the matters raised in his motion for new trial.

The first five assignments of error in the motion for new trial may well be grouped under one head, which attacks the sufficiency of the evidence.

It is not the province of this court to pass upon the weight of conflicting evidence, our function being only to determine whether

there was substantial evidence, if believed by the jury, to sustain a verdict of guilty. In determining its sufficiency, we take as true all the substantial evidence offered by the State together with all reasonable inference to be drawn therefrom. State v. Miller (Mo.) 202 S. W. (2) 887. State v. Peters (Mo.) 123 S. W. (2) 34.

We think the evidence was insufficient. It showed that a calf was killed by a rifle bullet. It was skinned, its head and [781] legs cut off and the carcass submerged in water. The tracks indicated that it was done by two men, but there was no evidence that they were made by shoes of the size or shape of those worn by defendants. The evidence as to the kind of guns they had that afternoon is not very satisfactory or convincing. The calf was discovered about 3:15 or 3:30 and though the carcass was submerged in cold water, when it was withdrawn therefrom, it was found to be still warm. The defendants were at the schoolhouse either at 12:30 or about two o'clock and when last seen, were going down the road east, which was in the general direction of the place where the carcass was found, but there is no evidence that they were ever within one-fourth mile of that place. From the schoolhouse to the place where the calf was killed was more than one-fourth mile and the shed, where the cattle were salted, was about midway between the schoolhouse and where the carcass was found. At 5 o'clock the defendants were again at the schoolhouse, more than a quarter of a mile from Brazeal Creek, waiting at a coal shed in the rear for Gregg to come and pick them up. They left their guns at Gregg's house, sitting on the front porch in plain sight of the road from that afternoon until sometime before midnight on the 17th. They were arrested on Tuesday afternoon and upon being questioned, denied that they had been together on the previous Sunday afternoon, denied that they had been to the Cedar Grove Schoolhouse or that they had seen or ridden with Gregg. At the trial, they admitted being together and that Gregg had taken them to the schoolhouse.

Clearly, omitting the conversations of the defendants while in the jail at Union, there is no evidence upon which a conviction could be sustained. Let us then examine that conversation as testified to by Trooper Arnold, in the light of all the circumstances. It must be remembered that defendants were arrested at 5 o'clock near their homes. They were taken to the jail at Union and were questioned about the Kimberlin calf on the way. They were also questioned about the Kimberlin calf and other larcenies of stock in Franklin County for about two hours immediately before they were placed in the cells. The Highway Patrolman had told them that he had discovered tracks from which he intended to make molds. Undoubtedly, such a thorough interrogation revealed to the defendants the evidence that Kimberlin and Patrolman Arnold had discovered at the scene of the crime. The testimony of the Highway

Patrolman does not indicate that any information they had discovered was kept from the defendants. Their conversation in the jail was not a confession of guilt. A careful reading of it will so demonstrate.

The statements "If we don't talk too much we will get out of this" and "I am afraid Gregg talked" are very suspicious but they do not admit the crime with which the defendants were charged in the information.

Missey said, "Did they get them prints of them shoes?" Considering the fact that the Highway Patrolman had told them he had discovered tracks and intended to make molds of them, this question is not of an incriminating character. From Coffman's remark, "Yes, that is the only thing they got on us", it would be just as reasonable to assume that he meant that the tracks were the only evidence the officers would have, as to construe it to be an admission that the defendants had made the tracks. If the Highway Patrolman had revealed to them that a bullet went through the head of the calf, (and he does not say he didn't) the statement of Missey, "They didn't get that bullet, that went on through" would be very natural and not necessarily incriminating.

The most that can be said of the conversation in the jail is that it raised a strong suspicion of their guilt.

The State depends for conviction in this case upon circumstantial evidence and the well known rule relative to such is that to authorize a conviction, the facts proven must form a complete chain, must be consistent with each other, must point to the guilt of defendant and be wholly inconsistent with any reasonable theory of his innocence. State v. Taylor, 347 Mo. 607, 148 S. W. (2) 802. State v. Battles, 357 Mo. [782] 1223, 212 S. W. (2) 753. State v. Woolard, 111 Mo. 248, 20 S. W. 27, State v. Hardy, 326 Mo. 969, 34 S. W. (2) 102.

A careful study of the evidence in this case convinces us that it does not measure up to this standard.

Paragraph 6 of the motion for new trial is as follows:

"Because the court prejudicially erred in admitting irrelevant and incompetent evidence, and evidence that was not connected with the alleged theft, to-wit, the alleged conversation of Defendants while incarcerated in the Franklin County jail and being questioned about a theft in Franklin County."

The record shows that upon objection of defendants, the court struck out and instructed the jury to disregard the italicized portion of the testimony of Patrolman Arnold heretofore quoted. That was the part that referred to an alleged theft at Sullivan in Franklin County. The remainder of their conversation was clearly about the evidence that the defendants thought the State might have

relative to the killing of the Kimberlin calf, for which they were tried. This testimony was admissible.

Section 7 of appellants' motion for new trial states: "Because the court prejudicially erred in giving to the jury instructions No. 3, No. 4 and No. 5, are unfair comment on the prior convictions and on a theory confused the issue, not in, evidence."

Instructions 3 and 5 refer to defendant Coffman, alone. He is now deceased and it is inconceivable how they could have injured the appellant even if they were erroneous, which they were not. State v. Hannon (Mo.) 204 S. W. (2) 915.

Instruction No. 4, in practically the same language, leaves it to the jury to decide whether defendant Missey had a prior conviction and also leaves it to them to decide whether he is guilty of the crime for which he was then on trial. It also is in proper form, and was not error. However, it could not have injured defendant Missey because they did not convict him under that instruction where the sentence would have been five years in the state penitentiary. The jury totally disregarded defendant's admission at the trial that. he had been previously convicted and served a sentence in the penitentiary, and found him guilty, only, as a first offender. So the instruction in the form given, relating to his prior conviction, could not have harmed him because the jury disregarded it. State v. Marlin (Mo.) 177 S. W. (2) 485. State v. Decker, 326 Mo. 946, 33 S. W. (2) 958.

We must therefore overrule defendant's objection to these instructions.

Next and last, it is complained that the court erred in failing to give an alibi instruction. The record does not show that such an instruction was requested. The court is not bound to instruct the jury upon the defense of an alibi as part of the law of the case under Sec. 4070 Mo. R. S. A., without a request from the defendant for such instruction. State v. Trice, 338 Mo. 744, 92 S. W. (2) 135. State v. Quinn, 344 Mo. 1072, 130 S. W. (2) 511.

Under section 4153, Mo. R. S. A. it is our duty in reversing a criminal case to direct a new trial or absolutely discharge the defendant "according to the circumstances of the case." A careful review of this record does not indicate that it would be impossible for the state to make a submissible case at the next trial. The Prosecuting Attorney, at a new trial, may be able to present new evidence and develop and clarify evidence that he already has. The case therefore should be reversed and remanded for a new trial. It is so ordered. All concur.