WELBORN, Commissioner.
Joseph Franz Arbeiter appeals from a sentence of life imprisonment upon conviction by a jury of murder in the first degree.
On the afternoon of December 2, 1963, Mrs. Nancy Zanone was stabbed by an intruder in her apartment at 4964 Chippewa Avenue in St. Louis. She died the following day without being able to describe her assailant.
Joseph Arbeiter, then fifteen years of age, resided with his mother at 4327a Morganford Road, in the neighborhood of the Zanone residence. Joseph had had several encounters with the St. Louis Police Department and officers acquainted with him considered him a daytime residence burglar.
Captain John Walsh of the St. Louis Metropolitan Police Department, Homicide Division, was in charge of the investigation of the death of Mrs. Zanone. On the morning of her death, the night sergeant called Captain Walsh’s attention to an attempted purse snatching and stabbing of Grace Munyon on November 28, 1963, in the area of Kingshighway and Chippewa, and near the Zanone residence. The sergeant suggested a similarity between the two attacks and at around 10:00 A.M. Captain Walsh called Sergeant Feldmeier of the First Police Department District and inquired whether or not “he had anyone in mind” in the Munyon case. Sergeant Feldmeier stated that he was looking for Arbeiter and when the captain stated that his theory was that Mrs. Zanone had encountered a prowler in her home, Sergeant Feldmeier stated that Arbeiter “had a past history of this type of behavior.” The officers agreed that efforts to locate Ar-beiter should continue.
According to Sergeant Feldmeier, he, prior to the telephone conversation with Captain Walsh, had directed Detective Corporal Stocker to “investigate” Arbeiter in connection with a series of residence burglaries in the vicinity of Kingshighway and Chippewa. At the time he gave that direction, he had neither the Zanone nor the Munyon case in mind. Corporal Stocker checked with the authorities at the school Arbeiter was supposed to attend and found that he had not attended regularly for some two weeks. Corporal Stocker reported this to Sergeant Feldmeier who told the corporal to keep looking for Joe. Corporal Stocker got in touch with Joe’s mother at her place of employment. She was surprised that Joe was not in school and Corporal Stocker asked her to have Joe remain at home that evening and he’d come by and talk to him.
Corporal Stocker continued to search the neighborhood for Joe and at around noon saw him walking along the street, stopped his police car and Joe got in without any question. Corporal Stocker took Joe to the First District Police Station. There Joe was taken to the detectives’ room where he was interrogated by Sergeant Feldmeier, Corporal Stocker and Officer Kraeger.
Despite Captain Walsh’s testimony that his prior conversation with Sergeant Feld-meier cast Joe in the role of a suspect in the Zanone and Munyon cases, both Feld-meier and Stocker testified that they were looking for Joe primarily in connection with house burglaries and that they first *28 questioned about several such incidents, all of which Joe denied. They then questioned Joe about his activity on preceding evenings and found that he had been at the Avalon Theatre on the night of the Munyon incident. Sergeant Feldmeier asked Joe whether or not he committed that offense and he readily admitted it.
The officers then began to question Joe about his being in the vicinity of the Zano-ne residence at the time of her stabbing. Although they had no such witness, they told Joe that a witness had placed him in the neighborhood of the Zanone residence. According to the officers, Joe was reluctant to discuss this matter, but he finally inquired whether or not he could go home if he told the truth. Corporal Stocker told him: “We don’t promise you nothing, whether you can go home or not. After we — we notify the Juvenile Authorities, it’s up to them what they — whether you go home or not.”
After some further reluctance, Joe said: “Well, I may as well tell you the truth. I was in that house. The woman caught me in her house, and I was scared, so I stabbed her and ran out.”
Captain Walsh was called and told of Joe’s statement. He directed the First District officers to take Joe to his residence and to get in touch with Joe’s mother and have her come to the house. Officers Feldmeier and Stocker took Joe to his home and Officers Haley and Kraeger went to Mrs. Arbeiter’s place of employment and got her.
Sometime after 1:30, Joe, in the custody of Feldmeier and Stocker, arrived at the Arbeiter residence and Captain Walsh and two other detectives also arrived. Mrs. Arbeiter was brought to the residence and she and Joe, accompanied by some six or seven police officers, entered the flat.
They went into the living room and Mrs. Arbeiter asked what Joe had done. A police officer told Joe to tell her and Joe said: “I stabbed that woman on Chippewa.” Mrs. Arbeiter said: “You don’t mean that woman that was killed in her home up there.” This remark was the first knowledge that Joe had that Mrs. Zanone had died.
The police officers asked Joe about the clothing he was wearing at the time of the stabbing. He showed them the jacket which he was wearing and the police officers took it. Joe was asked about the knife which he had used. He said it was in the garage. A knife was found there, but the police were skeptical about its being the weapon used. Upon further interrogation, Joe stated that he had buried the weapon he had used in a schoolyard. He accompanied the officers to the schoolyard and the knife was discovered.
At approximately four o’clock, Joe was taken to the Homicide Unit Office in police headquarters and Sergeant Kilroy, a police department juvenile officer, was called in, together with an assistant circuit attorney. The assistant circuit attorney questioned Joe briefly and then took a statement in question and answer form which was recorded by a stenographer and subsequently transcribed. Sometime later in the evening, Joe was turned over to the custody of juvenile authorities. A petition was filed in the juvenile court, alleging that Joe was within the applicable provisions of § 211.031 by reason of having violated a state law. The juvenile court, after investigation and a hearing, ordered that he might be prosecuted under the general laws. A grand jury subsequently indicted him for murder in the first degree.
In the trial court, the defendant objected to the introduction of evidence relating to his statements while in the custody of the police officers and to physical evidence acquired by the officers as a result of such statements. The trial court overruled his objections and on this appeal the action of the trial court is attacked as erroneous. Defendant’s contention is “that defendant was not, prior to making such statements, * * * advised of his rights to remain silent, to legal advice, or advice from a competent adult, and was not furnished *29 such advice and, therefore, such statements were not voluntary and such evidence was obtained in violation of defendant’s rights under the Juvenile Code of Missouri and under the Fifth, Sixth and Fourteenth Amendments of the Constitution of the United States.”
It is conceded that the police officers who dealt with the defendant were aware that he was fifteen years of age and therefore subject to the Juvenile Code and that the defendant was not turned over to juvenile authorities until after the statements had been made; that he was not advised of his right to remain silent or to consult a lawyer or an adult; that his only opportunity to consult with his mother arose from her presence at the home in the company of the police officers; that the only warning or advice which he received was from the assistant circuit attorney who advised the defendant that the statement which he took might be used against him, although he did not advise the defendant of his right to remain silent. There is no contention that the admissions were the product of actual or threatened physical harm to the defendant.
Additionally, there is no question that Joe’s age of fifteen subjected him to the exclusive jurisdiction of the juvenile court (§§ 211.021 and 211.031, RSMo 1959, V.A.M.S.) in any proceedings involving an alleged criminal offense. Furthermore, § 211.061 required a police officer taking him “into custody * * * for an offense” to take him “immediately and directly before the juvenile court” or to deliver him “to the juvenile officer or person acting for him.” In view of the legislative injunction found in § 211.011 that the Juvenile Code shall be liberally construed, we reject the state’s position that the questioning by the police was not in violation of § 211.061 because the police had the right to confirm that sufficient reason existed to take Joe before the juvenile court before they were required to do so.[1] Once the police considered that they had sufficient reason to take Joe into custody, they were required to take him “immediately and directly” to the juvenile court and it thereafter became the function of that agency to determine, in accordance with the procedures established by Chapter 211, whether or not sufficient grounds existed for the court’s exercise of its jurisdiction.
The question remains as to the effect of noncompliance with § 211.061. We reject appellant’s contention that subsection 3 of § 211.271, by its terms, renders inadmissible statements resulting from police questioning from the moment that a child is taken into custody. The prohibition of that section is against the use of evidence given in juvenile court cases against the child in criminal proceedings. The statements here in question were not “evidence given” in a juvenile court case. However, the absence of express statutory sanction against police procedures in violation of the Juvenile Code does not require that such violations be excused or ignored.[2] In State v. Shaw, 93 Ariz. 40, 378 P.2d 487, the court had before it the question of the admissibility of statements obtained from a juvenile by police interrogation in disregard of a statute (A.R.S. § 8-221) requiring that a police officer arresting a juvenile notify the probation officer “forthwith.” In holding inadmissible the statements obtained in *30 such circumstances, the court stated (378 P.2d 491-493):
“The philosophy which inspired creation of the juvenile court, and statutes implementing it, is that the state recognizes that in the majority of cases involving antisocial behavior (including criminal offenses) on the part of the youthful offenders, there is both a responsibility and an opportunity for the state, through special treatment in a non-criminal proceeding, to redirect and rehabilitate these young people. This operates for the benefit of the individual, and for society as a whole. However, in many states, as in Arizona, it is also recognized that there are certain individuals still within the chronological classification as juveniles, for whom this special treatment is futile. The juvenile court therefore may refuse to continue its jurisdiction in such cases, and may remand these individuals for regular proceedings in the criminal court. Under the law in Arizona, until the juvenile court, which has exclusive jurisdiction of all delinquent children or children accused of crime, has considered the matter and decided that the particular individual is not one who will benefit from its special treatment, a child offender remains in the juvenile jurisdiction.
“While under the juvenile court jurisdiction, a child is under certain disabilities not attaching to an adult. He is not entitled to be released on bail; he does not have the right of trial by jury, or right of compulsory process to compel the attendance of witnesses on his behalf guaranteed by the Arizona Constitution in criminal prosecutions. To compensate for some of these disabilities, the juvenule statutes provide that the juvenile probation officer shall act as a representative in his behalf, and further that if he is arrested by a peace officer, such officer ‘shall forthwith notify the probation officer, and shall make such disposition of the juvenile as the probation officer directs.’
“The need for special treatment begins at the instant the juvenile is contacted by peace officers and this was recognized by the legislature. A few hours of the treatment sometimes accorded mature and hardened criminals can give the impressionable mind of a youth an indelibly warped view of society and its interest in him.

“Unquestionably, the purpose of A.R.S. § 8-221 was to alter the usual method of handling persons arrested on suspicion or for investigation of criminal activities when those persons are juveniles. Moreover, it is apparent that this alteration of methods was intended to protect the interests of juveniles rather than to facilitate police investigations. Since a major feature of the usual treatment of newly arrested persons is interrogation, it follows that one of the purposes of A.R.S. § 8-221 is to protect the juvenile from the adverse effects of this procedure.
“We have carefully considered the possible means of enforcing the policy expressed in A.R.S. § 8-221 and have concluded that the means most in harmony with the purposes expressed and implicit in that section is to preclude the admission of statements obtained by the persuasion of police during the period when the section is being violated.”
In our opinion, this conclusion is entirely consistent with the philosophy of our Juvenile Code. While we recognize the interest of society in the protection of its members against criminal activity, the Juvenile Code recognizes that at the juvenile level, the problem is best proceeded against on a rehabilitative basis under special procedures for the benefit of the child. If our experience shows that the special procedures for the benefit of juveniles are producing results adverse to the best interests of society, then the legislative authority may resort to different procedures. In the meantime, we feel obligated to construe and apply the Juvenile Code as the Arizona court did, “to protect the *31 interests of juveniles rather than to facilitate police investigations.”
We are, of course, determining only the •question here presented. We do not consider the question of spontaneous statements by a juvenile prior to being taken before the juvenile judge or juvenile officer; nor do we consider statements of a juvenile in response to questioning after § 211.061 has been complied with.
We do not consider that the defendant waived his objection to the use of the statements obtained by the police by reason of the fact that experts who examined Joe pursuant to his defense of lack of mental capacity to commit a crime testified that he made similar statements to them. By § 552.030, RSMo 1959, V.A.M.S., such statements could be considered only on the issue of mental capacity.
In view of our conclusion, we do not reach the. formidable constitutional objections to the use of the defendant’s statements in this case. See Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325, 87 A.L.R.2d 614.
Inasmuch as we cannot conclude on the record before us that it would be impossible for the prosecution to make a sub-missible case against the appellant without the use of his statements, the cause should be remanded for a new trial, rather than reversed outright. State v. Missey, 361 Mo. 393, 234 S.W.2d 777; State v. Walker, Mo.Sup., 365 S.W.2d 597.
Reversed and remanded.
HOUSER and HIGGINS, CC., concur.
PER CURIAM:
The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.
All of the Judges concur.

. Even the state’s argument cannot justify the continued failure to comply with the requirement of § 211.061 after the police had confirmed that sufficient reason did exist to take defendant to the juvenile court. After the original statement of Joe, the police and the circuit attorney continued to disregard the requirement of § 211.061, presumably in furtherance of the desire of the police and the circuit attorney to “nail down” a murder charge against Joe.

. This court has applied, without statutory basis, the exclusionary sanction to evidence obtained by members of the State Highway Patrol in violation of the prohibition against their making searches and seizures. See State v. Smith, 357 Mo. 467, 209 S.W.2d 138, 139(1).