THE STATE v. JIM CROPPER, Appellant.—36 S. W. (2d) 923.

Division Two, March 25, 1931.

194

*Stratton Shartel*, Attorney-General, and *Edward G. Robison*, Assistant Attorney-General, for respondent.

196

HENWOOD, J.—The defendant appealed from the judgment, of the Circuit Court of Ozark County, where he was convicted of murder in the first degree and sentenced to imprisonment in the penitentiary for life, in accordance with the verdict of the jury.

The record in this case contains nearly five hundred typewritten pages of evidence. For the purposes of this opinion, however, the evidence may be stated within reasonable limits.

The following evidence was adduced by the State in its case in chief:

On August 28, 1929, Orval Shipley, the victim of the alleged murder, was shot and killed while driving an automobile in the vicinity of Sycamore, in Ozark County. At that time, Shipley was twenty-one years of age, and had lived near Fairfax, in Atchison County, for about two years. He had previously lived in Ozark County, in the neighborhood where he was killed, and had known the defendant who also lived in that neighborhood, for several years. Shipley and his wife and baby, two years of age, and his wife's brothers, Edward and Edgar Herd, had been visiting with Shipley's father and other relatives and friends for about a week. The defendant lived about a mile from the home of Shipley's father, and about a mile and a quarter from the place where Shipley was killed. On Thursday or Friday of the week before Shipley was killed, the defendant's son, Henry Cropper, asked Shipley and the Herd boys to go with him to a whisky still which was located near the defendant's home. They made the trip in Shipley's automobile, and Shipley and Edgar Herd remained in the automobile, some distance from the still, while Henry Cropper and Edward Herd visited the still, and got a quart fruit-jar of whisky and a gallon jug of beer. The defendant followed them to the still, and reprimanded his son, Henry Cropper, for going there, and went with them from the

still to the automobile, where he had a conversation with Shipley. The defendant accused Shipley of stealing a still from him while he (the defendant) was serving a term in the penitentiary. Shipley said he had nothing to do with that still. The defendant was carrying a shotgun that day. After they left the defendant, Shipley told the Herd boys he bought the still which the defendant accused him of stealing. On the following day, Friday or Saturday, Shipley and the Herd boys went to Gainesville and informed the sheriff of the still near the defendant's home. They told the sheriff it was the defendant's still. Thereafter, on Friday or Saturday night, the sheriff seized the still and destroyed it. On Sunday night, some one cut two tires on Shipley's automobile. On Monday night, five shots, from a shotgun, were fired into the rear of Shipley's automobile while Shipley was driving toward his father's home, with his family and his father's family and the Herd boys. Shipley stopped the automobile, and either he or one of the Herd boys returned the fire with three shots from a rifle they had borrowed that day and were carrying in the automobile "for protection." Earlier that evening, the defendant was seen in that neighborhood, carrying a gun, and, when he learned that Shipley had gone, shortly before, in a different direction, he changed his course, and went in the direction that Shipley had gone. On Tuesday morning, about eight o'clock, the defendant was seen again, carrying a gun, near the place where Shipley was killed in the morning of the next day. Between nine and 9:30 o'clock the next morning, Wednesday, August 28, 1929, Shipley left his father's home in his automobile, with his wife and baby and the Herd boys, and started on his homeward journey, to Atchison County. Shipley was on the left side of the front seat, driving, and Edward Herd on the right side. Mrs. Shipley was on the left side of the back seat, with the baby on her lap, and Edgar Herd on the right side. At a point about a quarter of a mile from the home of Shipley's father, while the automobile was proceeding slowly up a rocky hill, in a westerly direction, either two or three shots, from a shotgun, were fired at them from the south or left side of the road. Shipley was mortally wounded by the first shot, and an examination of his body disclosed numerous shot holes in his left shoulder and in the left side of his neck, face and head. One No. 4 shot was removed from his body by a physician. Edward Herd was hit in the face by the second shot and seriously wounded. Both Mrs. Shipley and the baby were hit in the face by stray shot or "shivers of shot," but not seriously wounded. Edgar Herd was not hit. Gunpowder smoke was seen in the trail of each of the shots fired. Edgar Herd testified: "When we got something like pretty close to the top of the grade, the gun fired on the east side of a tree; and Mr. Cropper,

that is, this defendant, Jim Cropper, walked out on the west side (of the tree) and fired the gun; and I left the car at that time. The last I saw him he was standing there, and I looked over the guard board, and he was standing there, had his gun set down by his side, hold of the barrel. He was looking toward the car.'' The shots were fired at a distance of about sixteen steps from the automobile. Lige Smith, a farmer in the Sycamore neighborhood, testified that, about 9:30 o'clock that morning, he saw the defendant, about a half of a mile east of the point where Shipley was killed, carrying a gun, and ''walking very fast'' through a field; and that, when the defendant saw him, the defendant ''dodged into the brush,'' and went up Bryant Creek, in the direction of Dewey Russell's home. Two empty shotgun shells were found at or near the place where shots were fired at Shipley and his companions, one on Wednesday, sometime after Shipley was killed, and the other on the following day. Both of these shells were New Club shells which had been loaded with black powder, for a No. 12 shotgun. A. P. Morrison, a storekeeper in the neighborhood where the defendant lived, testified that, in the spring of 1929, he sold to the defendant some New Club shells, for a No. 12 shotgun, loaded with black powder and No. 4 shot. D. S. Furnell testified that, sometime after Shipley was killed, the defendant told him he ''had had trouble with Shipley and the Herd boys.'' The sheriff testified that, after the defendant was arrested, the defendant said he and Shipley ''had a few words'' on the day he met Shipley and the Herd boys at the still near his home; that the defendant said he knew Shipley and the Herd boys informed him (the sheriff) as to the location of the still; and that he heard a conversation between the defendant and two other prisoners, in which the defendant told the other prisoners he was arrested ''for making liquor and for killing a man,'' and about Shipley and the Herd boys ''turning him in'' for having a still, and about ''the killing (of Shipley) taking place;'' and that one of the prisoners said: ''Every one of them that would turn a man in ought to be killed;'' and that, then, the defendant said: ''Well, there is one of them that will not turn nobody else in;'' and that the defendant also said: ''If I knew they was watching my still that night, I could have gone over there and run them plumb out of that hollow.'' And the sheriff further testified that, at eleven o'clock one night, about three weeks before the trial, he found the defendant on top of his cell, ''sawing with a hacksaw,'' and discovered that ''six rivets were cut out of the top of the cell.''

The defendant testified: He was forty-six years of age, and had spent most of his life in the neighborhood of Sycamore, in Ozark County. He had been married twice, and had eight children. He had no connection with the killing of Shipley, and did not know

who killed Shipley. He had a conversation with Shipley the day he met Shipley and the Herd boys and his son, Henry Cropper, at or near the still which was later destroyed by the sheriff. He asked Shipley about the still which he (the defendant) owned at the time he was convicted and "taken to the penitentiary" for violating the prohibition laws, and which was gone when he came back, but did not accuse Shipley of stealing the still. Shipley told him he did not take the still, nor know anything about it. He did not cut any tires on Shipley's automobile on the following Sunday night, nor at any other time, and he did not shoot at Shipley's automobile on the following Monday night, nor at any other time, and he knew nothing about those occurrences. He "never felt hard toward him (Shipley) in no way." He had Joe Hutchinson's Winchester rifle with him the day he had the conversation with Shipley. He had been hunting squirrels before he met Shipley that day. He had the same rifle with him on the following Monday evening, when he went to Sycamore and bought some groceries, and also on the following Tuesday afternoon, when he was hunting for a bunch of turkeys. He had not had a shotgun in his possession since the spring of 1929. At that time, and previously, he had borrowed shotguns, on several occasions, from Joe Hutchinson and Verna Smith. Both of these guns were pump guns. In the spring of 1929, he bought one box of "smokeless shells" and a box of "New Clubs" from A. P. Morrison. In the "last of May," 1929, he bought a box of "smokeless shells" at West Plains, and his son, Henry Cropper, bought "some" shells for him at Morrison's. He had not bought any shotgun shells since. He had not been near the place where Shipley was killed since he (the defendant) returned to his home from the penitentiary. He was not in that neighborhood on Wednesday, the day Shipley was killed, nor on the day before. He stayed at home on Tuesday until about two o'clock in the afternoon, when he started hunting for turkeys. On Wednesday morning, the morning Shipley was killed, he left his home "a little after eight o'clock," without a gun, and walked to Barker's sawmill in search of work. He could have gone there by traveling five and one-half miles in a northwesterly direction, over a direct route, without crossing Bryant Creek, but he went in a roundabout way, crossed Bryant Creek twice, and traveled twelve or fifteen miles. It was nine o'clock by his watch when he reached the farm of Dewey Russell, his nephew, two miles north of his home. Dewey took him across Bryant Creek on a mule. He visited with Dewey about an hour and a half, and then proceeded on his journey, meeting and visiting with various acquaintances along the way. He reached Barker's sawmill about four o'clock that afternoon, after crossing Bryant Creek again over a bridge. From there he started back toward his home, and stopped at the home of Ewing Loftis, where he stayed

that night. Arthur Ewing came there that night, and told him Shipley had been killed that day, and that he (the defendant) was accused of killing Shipley. About seven o'clock Thursday morning, he went "straight" to his home, a distance of three or four miles, over a direct route. He reached his home between eight and nine o'clock Thursday morning. He talked to Dewey Russell again Thursday morning, when he went to his mail box. Thursday afternoon, some of his neighbors told him the sheriff had a warrant for him. He and his wife stayed at the home of Dan Strong, his wife's father, Thursday night, and telephoned from there to the sheriff's office that he would come to the sheriff's office the next day. The next day, Friday, he went to the sheriff's office voluntarily and surrendered. When asked about the conversation between him and the other prisoners, concerning which the sheriff testified, the defendant said: "Well, I don't remember, if I talked any conversation of that kind." He admitted that the sheriff saw him on top of his cell, using a hacksaw, but denied that he was attempting to escape from the jail. He also said that another prisoner found the saw, "hanging up on a hook," in his (the defendant's) cell; and that he was "just fooling around" on top of his cell, trying to saw the legs of some old bed-steads; and that he did not saw any rivets in the top of his cell, but another prisoner did.

In corroboration of the defendant's testimony, Joe Hutchinson testified that the defendant borrowed his rifle during the month of August, 1929, but had not borrowed his shotgun since the spring of 1929. Henry Cropper, the defendant's son, testified that the defendant was carrying a rifle, and not a shotgun, the day he talked to Shipley about his still; and that the defendant asked Shipley if he got his still, but used "no rough language," and did not accuse Shipley of stealing the still. Charley Smith, a storekeeper at Sycamore, testified that the defendant had a rifle with him on the following Monday evening, when the defendant came to his store and bought some groceries. The defendant's wife testified that he had Joe Hutchinson's rifle, but no shotgun, at the time Shipley was killed, and that there had been no shotgun in their home since the previous spring; and she further testified that, on the morning Shipley was killed, the defendant left their home between eight and nine o'clock, without a gun. Dewey Russell, the defendant's nephew, testified that he took the defendant across Bryant Creek on a mule that morning at nine o'clock, according to the defendant's watch; and that the defendant visited with him an hour; and that the defendant had no gun. Ewing Loftis testified that defendant came to his home late in the afternoon of that day, and stayed there that night; and that Arthur Loftis came to his home that night, and told him and the defendant about Shipley being killed and about the defendant being accused of killing Shipley. Arthur Loftis

testified that he stopped at the home of Ewing Loftis that night, and told him and the defendant that Shipley had been killed that day and that the defendant was accused of killing Shipley.

In rebuttal for the State, the sheriff and prosecuting attorney both testified that Henry Cropper told them that the defendant was carrying Joe Hutchinson's shotgun the day the defendant had the conversation with Shipley. And the sheriff further testified that Dewey Russell told him the defendant "wasn't there (at Dewey's home) but a little bit" the morning Shipley was killed. Will Osborne testified that Dewey told him he took the defendant across Bryant Creek "sometime between nine and twelve o'clock." Charley Teeters testified that he talked to Dewey the day Shipley was killed, and Dewey told him "he had been out hunting a mule that morning." Elmer Berry testified that, the day Shipley was killed, he saw the defendant "up there in the branch;" and that, when he told Dewey about it, Dewey told him he "had better not be telling it;" and that Dewey also told him that something had happened over on the ridge that morning, and that the defendant got his mule that morning, and that he met the defendant "over there" and got his mule, and that the defendant said, if anybody came there looking for him, to tell them he crossed the creek about nine o'clock. Lige Smith testified that, two or three days after Shipley was killed, he and Shipley's father went up Bryant Creek, and found some mule tracks about a quarter of a mile from the place where he saw the defendant the morning Shipley was killed; and that these mule tracks "looked like a mule had been tied and had knocked around there;" and that, from this point to a point a half of a quarter of a mile farther up the creek, they found "the same tracks" made by a mule in coming to the point where it appeared to have been tied, and in going back up the creek; and that, in going to the place where a mule appeared to have been tied, they followed the tracks of a man from the point where he saw the defendant going through a field the morning Shipley was killed. Shipley's father testified to substantially the same effect as to the mule tracks; and further testified that, in going to the place where a mule appeared to have been tied, they followed the tracks of a man from a point in a field near Lige Smith's home.

Other evidence and proffers of evidence will be noted hereinafter.

The defendant has filed no brief. Therefore, we must refer to the assignments of error contained in the motion for a new trial, and consider all questions which have been preserved for our review.

I. The defendant complains, in his motion for a new trial, of the action of the trial court in not allowing him to talk to his wit-

nesses before the trial commenced, and in not allowing his counsel to talk to the State's witnesses in the absence of the State's counsel, and in reprimanding his counsel and his witness Curt Luna in the presence of the jury, but the record does not show the proceedings upon which these complaints are based.

II. No error was committed in permitting Shipley's wife, while on the witness stand, to exhibit her baby before the jury. She testified that, at the time Shipley was killed, the baby was sitting on her lap in the back seat of the automobile, and that the baby was hit by one shot, or "shivers of shot." This testimony was admissible as a part of the *res gestae*, and, in connection therewith, she was properly permitted to exhibit the baby, for the purpose of showing the jury the place, near his left eye, where he was hit.

III. Nor do we find any merit in any of the numerous complaints of the defendant relating to the admission and exclusion of evidence.

The sheriff's testimony, that Shipley and the Herd boys informed him of the whisky still near the defendant's home, was properly admitted for the purpose of showing a motive on the part of the defendant to commit the crime charged, there being other evidence tending to show that the defendant was operating the still, and that the defendant knew, at the time Shipley was killed, that Shipley and the Herd boys had "turned him in." The testimony of the sheriff, as to the statements made by the defendant in conversation with other prisoners, was admissible for the same purpose, and also for the purpose of showing an admission by the defendant that he was the man who killed Shipley.

The defendant is not in a position to complain of the testimony of Shipley's father as to the shots fired at his son's automobile on the Monday night before his son was killed, the defendant's counsel having inquired about this shooting, in his cross-examination of Shipley's wife, before Shipley's father, or any other witness for the State, testified about it. But, regardless of such inquiry on the part of the defendant's counsel, the testimony of Shipley's father concerning this shooting was admissible in connection with other evidence to the effect that the defendant was seen, carrying a gun, in the neighborhood where this shooting occurred, the night it occurred, and in connection with the testimony of Edgar Herd that the defendant was the man who shot and killed Shipley on the following Wednesday morning,

The testimony of A. P. Morrison, that the defendant bought some No. 12, New Club shotgun shells, loaded with black powder and No. 4 shot, at his store, in the spring of 1929, was properly admitted in connection with the testimony of other witnesses tending to show that Shipley was shot and killed with shells of that kind on August 28, 1929, it being a matter of common knowledge that shotgun shells will retain their effectiveness for a much longer period of time. Moreover, the defendant admitted, on the witness stand, that he bought a box of "New Clubs" from Morrison, and also that his son, Henry Cropper, bought "some" shells for him at Morrison's store, in the spring of 1929, and for that reason, he is not in a position to complain of Morrison's testimony, on the ground that his purchase of such shells is "too remote," or on any other ground.

The testimony of Lige Smith and Shipley's father concerning the mule tracks found by them along the bank of Bryant Creek, two or three days after the killing of Shipley, was admissible in connection with the evidence tending to show that the defendant had Dewey Russell's mule the morning Shipley was killed, and in connection with the evidence to the effect that the defendant was seen that morning, walking in the direction of the place where the mule tracks were found, about a quarter of a mile therefrom.

As to the part of Mrs. Jim Bell's testimony complained of in the motion for a new trial, it will suffice to say that the record shows no timely objection to such testimony.

The alleged prejudicial testimony of William Hauey, John Freeman and Sylvester Freeman was excluded and the jury instructed to disregard it, and, in our opinion, this action on the part of the trial court was sufficient to remove from the minds of the jury the prejudicial effect, if any, of such testimony.

Proof that the defendant requested the sheriff to have the two empty shotgun shells examined for finger prints would have been self-serving and was properly excluded on that ground. Proof that Shipley's wife, Edgar Herd and Edward Herd had been cautioned not to talk to the defendant's counsel in the absence of counsel for the State would have been immaterial, and was properly excluded on the State's general objection thereto. While these witnesses were under no legal obligation to talk to the defendant's counsel, they were free to do so at any time, regardless of the suggestions or directions of the counsel for the State.

Proof that the defendant and the defendant's witness Mrs. Lois Russell Hays had good reputations for truth and veracity was properly excluded, on the ground that their reputations for truthfulness were not attacked by the State. [State v. Marshall, 317 Mo. 413, 297 S. W. 63, and authorities cited.]

The defendant complains, in the motion for a new trial, of the exclusion of other evidence, but the record fails to disclose any offers of such evidence.

IV. Having given other instructions (3 and 4) on the defense of *alibi*, the trial court did not commit error in refusing the defendant's Instruction A covering the same subject-matter. [State v. Fike (Mo. Sup.), 24 S. W. (2d) 1027.]

V. In the motion for a new trial, the defendant makes the following challenge of the sufficiency of the verdict: "The verdict is insufficient to support a judgment and sentence of imprisonment in the penitentiary during the natural life of the defendant, because the verdict does not conform to the statute by stating during whose life the defendant be imprisoned nor in what place he be confined." The verdict reads as follows:

"We, the jury find the defendant, Jim Cropper, guilty of murder in the first degree as charged in the information and assess his punishment at life imprisonment.

"M. A. HOLT, Foreman."

The verdict names "Jim Cropper" as the man found guilty of murder in the first degree, and fixes "his" punishment at life imprisonment. Section 3984, Revised Statutes 1929, provides that persons convicted of murder in the first degree shall suffer death, or be punished by imprisonment "in the penitentiary" during their natural lives. There is only one penitentiary in this State. The verdict is sufficient, in every particular, to support the judgment and sentence "that the said defendant, Jim Cropper, having been found guilty as aforesaid be confined in the penitentiary of the State of Missouri for the period of his natural life." [State v. Pinkard, 318 Mo. 751, 300 S. W. 748, and cases cited.]

VI. The motion for a new trial contains only general complaints relating to instructions 1, 2, 3 and 4, and the failure of the trial court to instruct the jury on all of the law of the case. Such complaints present nothing for our review. [Sec. 3735, R. S. 1929; State v. Standifer, 316 Mo. 49, 289 S. W. 856.]

The defendant has not challenged the sufficiency of the information or the evidence. The information is in approved form, the evidence is amply sufficient to support the verdict, and, after a careful examination of the entire record, it is our conclusion that the defendant was accorded a fair and impartial trial.

The judgment is affirmed. All concur.