**STATE of Missouri, Respondent,**

v.

**Victor I. VARNER, alias Victor Woods, Appellant.**

**No. 47497.**

Supreme Court of Missouri,

Division No. 2.

Nov. 9, 1959.

Motion to Withdraw Opinion and Reconsider Appeal or to Transfer to Court en Banc Denied Dec. 14, 1959.

# 626

Will F. Berry, Jr., Jefferson City, for appellant.

John M. Dalton, Atty. Gen., Fred L. Howard, Grover C. Huston, Asst. Attys. Gen., for respondent.

BARRETT, Commissioner.

■ Upon circumstantial evidence and a charge of murder in the first degree, a jury has found that Victor I. ("Tex") Varner shot and killed Larry Dale Irwin, that he was guilty of murder in the second degree and, accordingly, fixed his punishment at ten years' imprisonment. In approved and appropriate language the information charged Tex with the offense of murder in the first degree (V.A.M.S. § 559.010), but the jury had the duty and could and did find the included and lesser offense of murder in the second degree and affixed the minimum punishment. V.A.M.S. §§ 556.-220, 559.020–559.030; State v. Boesel, Mo., 64 S.W.2d 243. The jury's verdict was responsive (V.A.M.S. § 559.030), the appellant was present when judgment was pronounced and throughout the trial, there was allocution, and sentence was appropriately pronounced. V.A.M.S. §§ 546.550–546.570; Supreme Court Rules 27.08–27.09, 42 V.A. M.S. Tex was tried upon a "first amended information" (V.A.M.S. § 545.290; Supreme Court Rule 24.02; 42 C.J.S. Indictments and Informations § 232, p. 1243), but an "amendment" is a change or correction (3 C.J.S., p. 1041), and the fact that the court's introductory and cautionary instructions referred to the fact does not necessarily mean or imply, as the appellant urges, that "more than one information was on file against defendant" and that the jury would be improperly prejudiced by the fact. 42 C.J.S. Indictments and Informations § 238, p. 1248; 23 C.J.S. Criminal Law § 1194, p. 742.

■ The information charged that "Victor Irvin Varner, alias Victor Woods" had been convicted of a felony in Illinois in 1931 and sentenced to ten years' imprisonment, and that "Victor Irvin Varner, alias Victor Woods" feloniously, wilfully, premeditatedly, and of his malice aforethought shot and killed Larry Dale Irwin. "Alias Victor Woods" was mentioned in the instructions repeatedly, and was referred to by state's counsel in qualifying the jury and otherwise during the trial. At the beginning of the trial there was a general and "formal" objection to "any reference" to the defendant as "alias Victor Woods," but there was no specific and formal attack upon the information and its repeated reference to the alias. The court's original ruling, overruling the general objection, may be subject to the interpretation that further objection to this subject would have been useless. It is not necessary, however, to consider in what precise circumstances and limitations the state may employ and refer to an "alias," the word, normally, carries an unfavorable connotation and its improper or unfair use may necessitate the granting of a new trial. Petrilli v. United States, 8 Cir., 129 F.2d 101; State v. Richards, 334 Mo. 485, 67 S.W.2d 58. But in the circumstances of this record the appellant was not unfairly or improperly prejudiced, and, in part, the state had no choice

other than to charge and in some connections refer to the appellant's alias. State v. Loston, Mo., 234 S.W.2d 535. The incontrovertible fact is that in 1931, in Illinois, the appellant was charged, tried, convicted, and served six and one half years of a ten-year felony sentence under the name of "Victor Woods." Thus the state in charging the prior conviction (V.A.M.S. §§ 556.280–556.290) necessarily alleged and proved the fact including the appellant's identity and alias. State v. Murray, Mo., 280 S.W.2d 809. And, as to both of these subjects, the alias and prior conviction, the jury, by its minimum sentence verdict, ignored the prior conviction and demonstrably, therefore, the appellant was not unfairly harmed by either the proof or the instructions. State v. Missey, Mo., 234 S.W. 2d 777.

◼ It is necessary to consider, preliminarily, another matter which has some bearing upon whether the appellant had a fair trial. Eddie Boysen and Larry Dale Irwin were found dead in a field, their bodies about forty feet apart; Eddie had been shot three times, once in the head, and Larry had been shot twice, once from behind the left ear and once in the back. Obviously they had been murdered and, one would suppose, at the same time and by the same person or persons. In any event, Tex Varner was charged with Eddie Boysen's murder, and upon the trial of that case he was acquitted. While the record in that case is not now before the court, the evidence in that case and the facts and circumstances were substantially the same as those before the jury in this case. In the course of this trial there were repeated references to the former trial; jurors were examined about it on voir dire, witnesses were asked whether they had testified on the former trial, sometimes it was sought to impeach witnesses by their former testimony, and counsel for the defendant, although the state's objections were sustained, repeatedly told the jury that Tex had been acquitted of Eddie's murder. There is some inconsistency in the positions of both the appellant and the state, the defendant attempting to prevent references to the former trial and yet constantly inquiring about the fact; on the other hand, state's counsel continually referred to the fact but attempted to conceal the result. In the circumstances of this case, "The admission of this record (judgment of acquittal in a companion case) was proper in that it tended to remove any inference that might otherwise have been drawn by the jury as to the effect of the testimony of the other offense. This course eliminated any reasonable possibility of the evidence complained of being considered by the jury as other than a part of the original transaction, and hence free from prejudicial effect." State v. Millard, Mo., 242 S.W. 923, 927.

◼ Nevertheless, there was no error of which the defendant may justly complain in any of these respects. While he did not have the court's assent, defendant's counsel frequently reminded the jury of the fact that Tex had been acquitted of Eddie's murder and they could not have been unmindful of the fact. Counsel repeatedly examined witnesses concerning their testimony at the other trial; for example, "Let's see, Mr. McDaniel, did you testify in the trial of Mr. Varner for the murder of Eddie Boysen?" Boysen's and Larry's bodies were found in Miller County, near the junction of Highways 54 and 42, Tex lived close by in Camden County, he was tried for Eddie's murder in Cole County and this trial was in Moniteau County. The jurors were examined by both parties as to whether they had formed opinions from reading or hearing accounts of the other trial (50 C.J.S. Juries § 238, p. 990), and some of them knew, incidentally, from reading or hearing the accounts that Tex had been acquitted of Eddie's murder. Although the evidence in the two cases was substantially the same (there is no circumstance from which it is a permissible inference that a single act of shooting resulted in both deaths), an acquittal in one case and a conviction in the other did not violate the "sec-

ond jeopardy" rule. Annotations 20 A.L.R. 341; 113 A.L.R. 222; 15 Am.Jur., Secs. 380, 390, pp. 53, 65; State v. Williams, Mo., 263 S.W. 195.

Furthermore, as will be apparent from a consideration of the case as a whole, if Tex shot and killed Larry, it was impossible to try the case without also detailing all the facts and circumstances surrounding the death of Eddie Boysen. This is not to infringe upon the general rule against showing other unrelated offenses, but as indicated and even though Tex was acquitted of Eddie's murder, if Larry and Eddie came to their deaths "under such circumstances as to constitute one single continuous accomplishment of a common design" and "the facts are so intimately related and the crimes so nearly concurrent that proof of one cannot well be made without a showing of the facts tending to establish the other" evidence concerning all the circumstances and both deaths is admissible. State v. Millard, Mo., 242 S.W. loc. cit. 926; State v. Hepperman, 349 Mo. 681, 162 S.W. 2d 878; State v. Quilling, 363 Mo. 1016, 256 S.W.2d 751. If the killing of two people is all a part of one transaction the evidence as to both deaths is competent, not because it shows another crime but because the single transaction circumstantially bears upon and establishes deliberation, if not motive. State v. Rasco, 239 Mo. 535, 574–575, 144 S.W. 449; State v. Holland, 354 Mo. 527, 189 S.W.2d 989. Being all a part of one transaction, as will subsequently appear, it was appropriate that witnesses, from photographs and personal observation, detail the location, relative distances and positions of the bodies and describe the gruesome wounds (State v. Holland, supra) and relate other connected physical circumstances, and the court did not err in admitting the evidence and permitting counsel's reference to it in their opening statements and arguments. State v. Bledsoe, Mo., 325 S.W.2d 762; State v. Mosley, Mo., 22 S.W.2d 784; State v. Rasco, supra; State v. Millard, supra.

These were the facts and circumstances, the relationship and background of the parties (26 Am.Jur., Sec. 321, p. 371) as the jury could find them: Highways 54 and 42 intersect on the Camden County-Miller County line, and the neighborhood is known as Prewitt's Corner. Southeast of the intersection, a short distance on Highway 42, is the Arnold farm, an abandoned gravel pit and a small once cultivated area called a field. East of the intersection there is a larger, triangular-shaped wooded area locally known as the Kaiser State Park, a part of "Lake of the Ozarks State Park." In connection with the state park there is a riding stable concession from which trail rides are conducted. Tex Varner's home is on Highway 54 north of the intersection, and southwest of the intersection adjacent to the large triangular area Tex owned a resort, a sort of dude ranch, called the Western Fun Arena. There he conducted rodeos and country-style dances and had a riding stable from which he too conducted trail rides. A part of his horseback-riding trail was through a wooded area back of his arena, alongside the overgrown field and along if not in a part of the large wooded triangular-shaped park area.

Tex had once had the riding stable concession in the state park but when his contract expired in April 1956 Marjorie ("Marj") Roberts, in competitive bidding, acquired the concession and she and Eddie Boysen, her husband prior to 1934, lived in the "Homestead" and operated the state park concession. As a general handy man and aid to Eddie Marj employed a young boy, George McDaniel, age fourteen. On July 1, 1957, four days before he was found shot, she employed another young boy, Larry Dale Irwin, age sixteen. Immediately upon Marj's taking over the state park concession there was trouble and ill will, particularly between Eddie and Tex. Tex's fences were cut, and although Tex had not caught them in the act, Eddie and George McDaniel built barbed wire fences and barbed wire entanglements across his trail

paths and "posted" the state park area. Once, in the spring of 1957, one of Varner's horses got out and "came to our place" and either Marj or Eddie called him. When Tex came for the horse there was an argument because he refused "to let us put a sign on a certain corner and we in turn refused to put his road posters" and, as Marj said, "one word led to another" and "he called Eddie a son-of-a-bitch, so Eddie grabbed him and shook him 'If you was a man instead of a half pint I would throw you out of here' and Mr. Varner with a sharp answer walked off to his car and they left."

In July 1956 and again in June 1957 Tex had a highway patrolman come to the arena, he told the patrolman that his fence had been cut in sixteen or seventeen places and showed him the barbed wire entanglements across his bridle path, "said Eddie Boysen had erected the barricades." This patrolman inadvisedly counseled Tex, "if I was you I would lay out here and catch this fellow in doing it." Tex replied, "Sergeant, I don't know how many times I have laid out here." Tex told another patrolman about the fences and when the patrolman asked who had cut them Tex said, "You know as well as I do, and if I ever catch him they can call Louie Phillips (the undertaker) at Eldon, they won't need to call you." To an acquaintance, no names were mentioned, Tex "just said if the man in the park came back over, he was sure he was the one that done it, that he would leave him laying." To Earl McDaniel, father of George and a member of the coroner's jury, Tex said, " 'Boysen is tearing up my rodeo ground, cutting water holes and everything over there,' he said, 'I will be hid over there some night when he thinks I am home asleep and I am going to leave him laying' is the words he told me."

These specific threats and expressions of ill will were directed against Eddie Boysen, but the appellant overlooks the fact that in connection with these expressions he also made other general threats against anyone from the state park concession and particularly against Eddie's helper. To a deputy sheriff of Camden County Tex threatened, " 'If I catch *anybody* in there' * * * 'I will just leave *them* lay there and call you.'" On the 28th day of June 1957, seven days before Eddie and Larry disappeared, Tex went to a feed store in Eldon to buy oats and found that the dealer had sold his oats to Eddie Boysen. Tex said, " 'Well, I wouldn't have cared if you had sold them to anybody else,'" and he told the dealer about his troubles and Boysen's cutting his fences and "cutting down his signs that he put up, *him and his helper*," and he said "a lot of stuff" concluding with, " 'I will get even with the dirty son-of-a-bitch.'" On July 4, 1957, the day before Eddie and Larry disappeared, Tex and a friend were in the Owls Club and "we were talking about various things and the subject of fence cutting came up and Tex said that if he caught a man—*any of those fellows from the Park fooling around his fences,* why that would be it."

If Tex shot Eddie and Larry he may have mistaken Larry for George McDaniel (1 Wharton, Criminal Evidence, Sec. 192, p. 384), but, as indicated, it was all a part of one transaction and evidence of his threats against a class or group of which Larry was one was admissible, as from the evidence the jury could find ill will and malice and in this instance of circumstantial evidence the motive of revenge. 1 Wharton, Criminal Evidence, Sec. 197, p. 394; 26 Am. Jur., Secs. 358–359, pp. 403–404; State v. Wheaton, Mo., 221 S.W. 26, 29; State v. Hermann, Mo., 283 S.W.2d 617, 621. In State v. Meidle, Mo., 202 S.W.2d 79, 80, in speaking of infuriating hunters, the threat was "listen, when they get on this farm they haven't got a leg to stand on." It was said, 202 S.W.2d loc. cit. 82, that "the statements were not definitely made against deceased and his brother, yet, deceased and his brother were trespassers and so were of a class against whom, in general, defendant had made the statements."

On Friday, July 5, 1957, shortly after supper, Eddie and Larry left the "Home-

stead" in Eddie's yellow automobile and Marj did not see them again. They were last seen alive by Don Ray Arnold, age twelve, who was sitting on a "road roller" at the gravel pit when Eddie parked his automobile at the fence, near the overgrown field. Just before eight o'clock and as Don was about to go home "they went across the field, there is a small brush in over in there this side of an old road that runs along the timber, and they went into that and across the old road into the timber." About eight o'clock, but still daylight, a man who lived just east of the Western Fun Arena heard at least three shots, one right after the other. Between seven and eight o'clock Dave Schaffer and his wife drove into the arena from Camdenton to deliver weiners and meat. Tex's green pickup truck was parked at the stable, one of the cab doors open, but there was no one around the arena and they drove down the highway to the Varner home and delivered the order of meat. Mrs. Varner and the children were at home but they did not see Tex and his truck was still parked at the stable as they drove past at 8:15.

By morning neighbors were looking for Eddie and Larry, they saw the yellow automobile at the gravel pit and followed the bridle paths down back of Varner's arena but they did not find Eddie or Larry. One of the neighbors told Tex that he was looking for Eddie but Tex had not seen him, said " 'don't like the big son-of-a-bitch' " but would aid in the search. Later in the morning, Saturday, Tex took seven or eight tourists on a trail ride and as they emerged from the woods at the overgrown field, Tex on the lead horse followed by Mr. and Mrs. Maines from Festus, Mrs. Maines' horse shied and Mr. Maines "swung wide and when I swung wide why I saw two men laying out in the field." Mr. Maines called to Tex, told him that two men were laying out there in the field but Tex said he was crazy. The trail party rode on to the top of a hill and when they came back over the trail rode up to the bodies in the field. Tex first told Mr. Maines that he did not know the two men, later he said, "Just what I figured," and Mrs. Maines heard him say, " 'it looked like Eddie Boysen and his helper.' " Tex said that he would call the sheriff and the party returned to the arena and after a delay of fifteen or twenty minutes Tex called Jack Stotler, the sheriff of Camden County.

In the meanwhile, again talking to the neighbor who had been searching for Eddie, Tex said, " 'Walt, * * * what could I have done to anyone to make them do a thing like this to me? * * * What am I going to do?' " Walt replied, "Well, Tex, * * * I don't know; if your conscience is clear you can remember who you saw last night, you don't need to be in any trouble. * * * You know you talked to me last night (at the arena) until after 7 o'clock, * * * you can certainly remember the places that you were last night." Finally, in the course of their talk, Tex said, " 'A man has got a right to protect his own property, hasn't he?' "

Jack Stotler arrived shortly and he, together with the sheriff of Miller County, highway partolmen and others went to the field where the bodies lay—Tex went along, riding with Stotler. Eddie's body was 125 feet 9 inches north of the fence corner at the field and Larry's body was 46 feet 6 inches from Eddie's. The bodies were examined then and later, they were photographed as they were found (2 Wharton, Criminal Evidence, Sec. 686, p. 650; State v. Moore, Mo., 303 S.W.2d 60, 65–66; State v. McHarness, Mo., 255 S.W.2d 826, 829) and distances were measured, some by stepping off (31 C.J.S. Evidence § 102, p. 708), and it was four and one half minutes walking time from the bodies in the field to the stable gate at the arena. 40 C.J.S. Homicide § 245, p. 1184; 2 Wharton, Criminal Evidence, Sec. 551, p. 415. An osteopathic physician, qualified by the usual standards (2 Wharton, Criminal Evidence, Secs. 545–546, pp. 406–412), exam-

ined the bodies and described the five wounds on the two bodies, it was his opinion that Larry and Eddie had been dead fifteen to twenty hours, no longer than twenty, probably nearer seventeen. See, Gradwohl, Legal Medicine, p. 127. The doctor could not express the opinion that all the wounds had been inflicted by the same weapon, but he described the bodies and all the wounds in graphic detail. Thirty-one feet six inches from Larry's body an empty .32 caliber cartridge case was found, and beneath Eddie's head an expended .32 caliber bullet was dug from the earth; no other cartridges or bullets were found. State v. Shawley, 334 Mo. 352, 67 S.W.2d 74; State v. Brotherton, Mo., 266 S.W.2d 712. While in the field Tex had another conversation with the patrol sergeant; among other things he observed, " 'Sergeant, this looks bad for me.' "

On the following Monday, after the inquest, Tex again called Jack Stotler and asked him to come to the arena. Tex wanted to talk about the inquest, and in the course of a long conversation (State v. Cropper, 327 Mo. 193, 202, 36 S.W.2d 923, 927) Jack asked Tex if he knew anyone who owned a 32 Winchester Special rifle, and Tex said, " 'Why, I do.' " Then Jack informed Tex that he would have to pick up the rifle for ballistics tests, Tex talked and showed him the barbed wire fences across his bridle path and after "a couple of hours or more" Jack again said that he had to have the gun. Tex showed him a holstered 357 Magnum and in the back of another of his trucks a "410 22 over-and-under" gun also in a scabbard (these guns were described as a part of the conversation but were not offered in evidence, State v. Riley, Mo., 270 S.W.2d 741), and finally Tex said that they would have to go to the house to get the serial number of the Winchester. Jack said that the serial number wouldn't do him any good now, he wanted the gun, but Tex said, " 'Yes, it will, * * * you will have to find the gun.' " Jack's response was,

"No, Tex, it looks like you are, you are the one that is going to have to find it, it looks like you are the one that is behind the 8-ball and you are in trouble." Tex suggested that they go for another beer—they went for the beer and then drove to Tex's home where Tex obtained and gave Jack the serial number of a 32 Winchester Special rifle—number 1772425 —and a full box of .32 Winchester shells, "Peters manufacture." But he did not give Jack the gun and he did not then claim that it had been lost or stolen. It so happened that in deer hunting seasons past Tex had loaned the Winchester to a friend and when he returned it on one occasion gave Tex the shells he had purchased, "they was Winchesters." Prior to the trial in Cole County Tex had inquired of this witness "if I had been questioned about them shells." To another friend and neighbor who had previously talked about the gun Tex said, on July 14th, " 'Well, you don't need to worry about the gun; it is taken care of' "—said that the gun had been taken from his truck.

Six months later, on January 28, 1958, workmen bulldozing and clearing off a wooded area near an old road on the west side of Highway 54, a short distance from the arena and between the arena and Tex's home, found the 32 Winchester Special rifle in its scabbard—serial number 1772425. The workmen called Jack Stotler and Jack turned the gun over to the highway patrol. There were latent fingerprints on the gun, they were lifted, enlarged, and compared to known fingerprints and they were the fingerprints of Tex's "right little and right ring finger." It is not necessary to detail his qualifications and describe the firearms and fingerprint tests (by the usual standard the witness was qualified in these two respects, annotation 26 A.L.R.2d 892), it is sufficient to say that it was the opinion of the experienced lieutenant in charge of the highway patrol laboratories that the expended .32 caliber bullet found beneath Eddie's head and the empty .32 cartridge case found near Larry's body had both

been fired from Tex's 32 Winchester Special rifle. Without elaborating on the subject and considering in detail the various objections, these opinions and the accompanying test exhibits were admissible in evidence; the fingerprints as circumstantial evidence of identity (annotation 28 A. L.R.2d 1115) and the firearm testimony for the probative force the jury may have attributed to it to connect the gun, the spent bullet and the empty cartridge case with Larry's and Eddie's deaths. State v. Shawley, supra; State v. Richetti, 342 Mo. 1015, 119 S.W.2d 330; State v. Brotherton, supra; State v. Couch, 341 Mo. 1239, 111 S.W.2d 147; State v. Hampton, Mo., 275 S.W.2d 356; annotation 31 A.L.R.2d 693.

It is not necessary at this juncture to recapitulate and indicate all the permissible inferences and specifically point out just what the jury could reasonably find in all these briefly narrated circumstances, neither is it necessary to expound upon the essential elements of first and second degree murder; it is sufficient to say that from all the circumstantial evidence the jury could find that Tex shot and killed Larry Irwin as well as Eddie Boysen, and, of course, if he did he was guilty, as the jury also found, of murder, in the second degree. V.A.M.S. §§ 559.010–559.020; State v. Glahn, 97 Mo. 679, 11 S.W. 260. A charge and proof of murder in the first degree of necessity includes and supports a conviction of murder in the second degree. 41 C.J.S. Homicide § 328(d), p. 73; State v. Clinton, 278 Mo. 344, 213 S.W. 841.

In connection with the opinion evidence there is but one troublesome problem. The highway patrol lieutenant who qualified as an expert and took the photographs and who qualified and testified to the firearms and fingerprint tests also attempted to qualify and leave the definite impression that he could say from an examination of the wounds on the two bodies that both men had been shot with a .32

caliber rifle. Qualified witnesses have often been permitted to give the opinion that the bullet which killed the deceased was fired from a particular weapon (26 Am.Jur., Sec. 440, p. 460; 23 C.J.S. Criminal Law § 868, p. 82), but it is indeed another matter for a witness to say that, either from scientific knowledge or wide personal experience and from wounds alone, the wounds were inflicted by a particular weapon, here a .32 caliber rifle. The opinion has been permitted by doctors upon pathological examination (State v. Sullivan, 230 Iowa 817, 298 N.W. 884; People v. Wong Chuey, 117 Cal. 624, 49 P. 833; Humphrey v. State, 74 Ark. 554, 86 S.W. 431), but it is not believed that this witness whose special training was as a chemical engineer was qualified by a very limited experience to testify with confident integrity as an expert on this particular subject. In this instance, however, his attempt to qualify and testify was not prejudicial. In the first place, his opinion was, "I think they could have." On cross-examination he was asked "whether there is any way to ascertain whether those wounds were inflicted by a rifle or a pistol." He replied, "No, I don't believe there is any absolute way to tell." He could not say that Larry's wounds had not been inflicted with a pistol or "definitely" that they had been inflicted by a rifle. So, in the end, his was not a very impressive or weighty opinion. In the second place, all the relevant facts were before the jury in great detail, there were photographs and detailed descriptions of the wounds and from this mass of detailed information the jury's opinion and inferences as to the offending weapon were as intelligent as the circumstances permitted. Annotation L.R. A.1915B, p. 1143; 31 A.L.R.2d 693, 696; 23 C.J.S. Criminal Law § 868, p. 82.

It so happens in this particular case, it may be noted in passing, that the verbal descriptions of the wounds were far more graphic and gruesome than the "natural color" photographs and for that reason the photographs were not as inflam-

matory as they might have been in other circumstances. The surroundings had changed, there were individual photographs of the Western Fun Arena and enlarged aerial photographs of the entire area and the trial court did not err in denying the defendant's request that the jury be permitted to visit and inspect the area. 23 C.J.S. Criminal Law, § 986, p. 332; State v. Pease, Mo., 133 S.W.2d 409. The court's statement to defense counsel, "You may state what you intend to prove," or the court's sustaining objections to certain questions and arguments, did not indicate what the judge thought the defendant had to prove, did not improperly reflect on either counsel or the defendant and were not prejudicial. State v. Rose, Mo., 249 S.W.2d 324, 334; State v. Thursby, Mo., 245 S.W.2d 859.

▇ While motive is a significant if not an essential element in a circumstantial evidence case of homicide (State v. Aitken, 240 Mo. 254, 144 S.W. 499; State v. Concelia, 250 Mo. 411, 157 S.W. 778), the court did not specifically and separately instruct the jury upon the subject and the defendant did not appropriately request or offer an instruction on this subject or conversely of other instructions (State v. Layton, 332 Mo. 216, 58 S.W.2d 454), hence he may not now complain. State v. Melvin, 166 Mo. 565, 66 S.W. 534; 41 C.J.S. Homicide § 359, p. 135, and compare State v. Taylor, 356 Mo. 1216, 205 S.W.2d 734, which was not a circumstantial evidence case.

▇ No witnesses were called to testify on behalf of the defendant and Tex did not avail himself of his right to testify, therefore, the fact of his failure to testify could not be "referred to by any attorney in the case" (V.A.M.S. § 546.270), the penalty being that he would be entitled to a new trial. State v. Shuls, 329 Mo. 245, 44 S.W.2d 94; State v. Conway, 348 Mo. 580, 154 S.W.2d 128. In the course of the state's argument counsel said, "they will come to you with the defense in this case

that I say has made this case easy for your decision here, because they stand here stripped of all defenses, they have offered no defense to you." The court sustained an objection to that argument and instructed the jury to disregard it but the court refused to declare a mistrial. Immediately counsel again said, "There is no defense before this jury. If there is a defense I ask the gentlemen to tell us what it is," and again the court sustained an objection to the argument. It has been held that comparable statements, for example, "Did they make any defense to it?" did not constitute a reference, either directly or indirectly, to the defendant's failure to testify and therefore the defendants in those instances were not entitled to new trials. State v. Johnson, 362 Mo. 833, 245 S.W.2d 43; State v. McCleave, Mo., 256 S.W. 814; State v. Murray, Mo., 280 S.W. 2d 809; State v. Hayzlett, Mo., 265 S.W.2d 321. Nevertheless, a caveat should follow these cases; they do not necessarily mean that state's attorneys are licensed to hazard these borderline arguments with impunity, despite the failure to object or the court's sustention of objections their cumulative effect may so manifestly offend the injunction of the statute and its companion constitutional prohibition (Const.Mo. Art. 1, Sec. 19, V.A.M.S.; State v. Conway, supra) as to compel affirmative action and the granting of a new trial. State v. Mosier, Mo., 102 S.W.2d 620; State v. Rhoden, Mo., 243 S.W.2d 75. In this particular instance good faith of counsel is assumed, and the statement does fall within the Johnson case.

▇ During the trial of this case the jury was not permitted to separate (V.A. M.S. §§ 546.230–546.240), but the fact that women jurors received clothes and other personal effects from an unauthorized person (a husband of one and a neighbor of another) or that jurors accompanied by deputy sheriffs casually encountered other people in the public rest rooms was not such improper conduct or prohibited separation on the part of the jury as to de-

mand the granting of a new trial. V.A. M.S. § 547.020; State v. Shawley, supra; State v. Blakely, Mo., 24 S.W.2d 1020; State v. Emrich, Mo., 252 S.W.2d 310.

Thus, without enumeration and seriatim consideration, the sixty assignments in the appellant's motion for a new trial, including the claimed cumulative effect of certain alleged errors (24 C.J.S. Criminal Law § 1948(b), p. 1100; State v. Mosier, supra; United States v. Donnelly, 7 Cir., 179 F.2d 227), have all been considered and singly or in combination they do not demand the granting of a new trial, and, therefore, the judgment is affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.